E

**EXHIBIT A**

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:              )      CDC Number H-40124
                         )
HUY DANG                 )
                         )
_____)

COPY
INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 1, 2006

8:40 A.M.

PANEL PRESENT:

Mr. Philip Inglee, Presiding Commissioner
Ms. Barbara Moore, Deputy Commissioner

OTHERS PRESENT:
Mr. Huy Dang, Inmate
Mr. Dejon Lewis, Attorney for Inmate
Mr. Robert Bulloch, Deputy District Attorney
Mr. Andy Mein, Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

J. Farncomb              Peters Shorthand Reporting

ii

## INDEX

|                                   | PAGE |
|-----------------------------------|------|
| Proceedings                       | 1    |
| Case Factors                      | 14   |
| Pre-Commitment Factors            | 36   |
| Post-Commitment Factors           | 46   |
| Parole Plans                      | 39   |
| Closing Statements                | 71   |
| Recess                            | 78   |
| Decision                          | 79   |
| Adjournment                       | 91   |
| Transcriber Certification         | 92   |

--oOo--

1

1          P R O C E E D I N G S

2          DEPUTY COMMISSIONER MOORE:   We're

3    recording.

4          PRESIDING COMMISSIONER INGLEE:   This is

5    an Initial Parole Consideration Hearing for Huy

6    Dang, D-A-N-G, CDC number H-40124.   Today's date

7    is June 1, 2006, and as noted the time is 8:40.

8    We are located at CTF, Soledad.   The inmate was

9    received on 7/8/1992, and was committed from San

10   Bernardino County.   His life term began on

11   12/30/1999.   The inmate's minimum eligible

12   parole date is 12/30/2006.   His controlling

13   offense, which the inmate has been committed, is

14   set forth in Case Number SCR55894.   Charged in

15   Count 16, kidnap, robbery-armed, and that's

16   Penal Code Sections 209(b), W12022(a)(1).   The

17   inmate received a term of 16 years to life, and

18   the base term was life with an enhancement of 16

19   years.   This Hearing is being tape-recorded and

20   for the purpose of voice identification each of

21   us is required to state our first and last

22   names, spelling our last name.   When it comes to

23   the inmate's turn you will spell your last name

24   and give us your CDC number.   Starting out with

25   myself and then going to my left, my name is

26   Philip Inglee, I-N-G-L-E-E, and I'm a

27   Commissioner.

2

1      **DEPUTY COMMISSIONER MOORE:** Good morning,

2   I'm Deputy Commissioner Barbara Moore,

3   M-O-O-R-E, with the Board of Parole Hearings.

4      **DEPUTY DISTRICT ATTORNEY BULLOCH:** Robert

5   Bulloch, B-U-L-L-O-C-H, Deputy District

6   Attorney, San Bernardino County.

7      **ATTORNEY LEWIS:** Dejon Lewis, L-E-W-I-S,

8   Attorney for Mr. Dang.

9      **INMATE DANG:** Huy Dang, D-A-N-G, H-40124.

10      **INTERPRETER MEIN:** Andy [phonetic] Mein

11   [phonetic], Interpreter.

12      **PRESIDING COMMISSIONER INGLEE:** Before we

13   go any further I'm going to swear in the

14   interpreter. Please raise your right hand. Do

15   you solemnly swear that in acting as an

16   interpreter at this Hearing you will accurately

17   and correctly interpret the proceedings to the

18   best of your ability.

19      **INTERPRETER MEIN:** I do.

20      **PRESIDING COMMISSIONER INGLEE:** Fine,

21   thank you. Mr. Dang, can you, in front of you -

22   - and this is the reason that I asked you about

23   your English -- there is an ADA statement that I

24   will ask you to read. If you cannot read it

25   then I'll ask the interpreter to read it for you

26   in Vietnamese.

27      **INMATE DANG:** I will read.

3

1      **PRESIDING COMMISSIONER INGLEE:**  All

2  right, if you have problems just stop.

3      **INMATE DANG:**  ADA, Americans

4      with Disabilities Act.  The

5      Americans with Disabilities Act,

6      ADA, is a law to help people with

7      disabilities.  Disabilities are

8      problems that make it harder for

9      some people to see, hear, breathe,

10     talk, walk, learn, think, work, or

11     take care of themselves than it is

12     for other.  Nobody can be keep out

13     of public place or activity

14     because of a disabilities.  If you

15     have a disability, you have to

16     right, the right to ask for help

17     to get ready for your BPT Hearing,

18     get to the Hearing, talk, read

19     forms and papers, and understand

20     the Hearing process.  BPT will

21     look at what you asked for to make

22     sure that you have a disability

23     that is covered by the ADA, and

24     that you have asked for the right

25     kind of help.  If you do not get

26     help or if you don't think you got

27     the kind of help you need, ask for

4

1        a BPT 1074 Grievance Form,

2        Grievance Forms.  You can also get

3        help to fill it out.

4        **PRESIDING COMMISSIONER INGLEE:**  Did you

5    understand what you read?

6        **INMATE DANG:**  Yes, sir.

7        **PRESIDING COMMISSIONER INGLEE:**  All

8    right.  Your records reflect that you did, also,

9    sign a BPT Form 1073, and that was signed on

10   7/6/2005, and at that time you said that you did

11   not need any help for your Parole Hearing.  Is

12   that still correct?  You should use your

13   interpreter for this.

14       **INMATE DANG THROUGH INTERPRETER:**  He said

15   he asked for an interpreter.

16       **PRESIDING COMMISSIONER INGLEE:**  Yes, but

17   he doesn't have any physical limitations.

18       **INMATE DANG THROUGH INTERPRETER:**  No.

19       **PRESIDING COMMISSIONER INGLEE:**  Of

20   course, you have an interpreter here.  I think

21   we probably should interpret going through --

22       **INMATE DANG:**  All right.

23       **PRESIDING COMMISSIONER INGLEE:**  -- so

24   this Hearing doesn't last for -- yeah, okay.

25   All right, do you have any problems walking up

26   and down stairs or for a distance of 100 yards

27   or more?

5

1        INMATE DANG THROUGH INTERPRETER:  Okay,

2    he said he sometimes has trouble walking up and

3    down (indiscernible) because he just had an

4    operation about a year ago.

5        PRESIDING COMMISSIONER INGLEE:  Did he

6    have a difficult time coming to the Hearing

7    today?

8        INMATE DANG THROUGH INTERPRETER:  No.

9        PRESIDING COMMISSIONER INGLEE:  All

10   right.  Does he need glasses or a magnifying

11   device in order to see?

12       INMATE DANG THROUGH INTERPRETER:  No.

13       PRESIDING COMMISSIONER INGLEE:  Does he

14   have any hearing impairments?

15       INMATE DANG THROUGH INTERPRETER:  No.

16       PRESIDING COMMISSIONER INGLEE:  Has he

17   ever been included in a Triple CMS or EOP

18   program?

19       INMATE DANG THROUGH INTERPRETER:  No.

20       PRESIDING COMMISSIONER INGLEE:  Does he

21   know what they are?

22       INMATE DANG THROUGH INTERPRETER:  Yes.

23       PRESIDING COMMISSIONER INGLEE:  What are

24   they?

25       INMATE DANG THROUGH INTERPRETER:  Okay,

26   they're programs for the people that have a

27   problem (indiscernible) went to sleep and things

6

1  like.

2       PRESIDING COMMISSIONER INGLEE:  Tell him

3  that they are -- these are problems dealing with

4  emotional or mental problems.  And has he ever

5  been treated for either one of the two?

6       INMATE DANG THROUGH INTERPRETER:  No.

7       PRESIDING COMMISSIONER INGLEE:  All

8  right.  How far did he go in school before he

9  came to prison?

10       INMATE DANG THROUGH INTERPRETER:

11  Eleventh grade.

12       PRESIDING COMMISSIONER INGLEE:  Eleventh

13  grade.  Did he take any special education

14  classes while he was in school?

15       INMATE DANG THROUGH INTERPRETER:  Okay, I

16  attend ESL.

17       PRESIDING COMMISSIONER INGLEE:  I'm

18  sorry.

19       INMATE DANG THROUGH INTERPRETER:  ESL,

20  that means second language.

21       PRESIDING COMMISSIONER INGLEE:  Second

22  language.

23       INMATE DANG THROUGH INTERPRETER:  English

24  is second language.

25       PRESIDING COMMISSIONER INGLEE:  All

26  right, we understand that and we've taken care

27  of that by having an interpreter.  All right,

7

1  finally, does he suffer from any disability that
2  would prevent him from participating in this
3  Hearing today?
4        **INMATE DANG THROUGH INTERPRETER:**  No.
5        **PRESIDING COMMISSIONER INGLEE:**
6  Counselor, do you have any comments or concerns
7  regarding your client's ADA rights?
8        **ATTORNEY LEWIS:**  No, I do not.
9        **PRESIDING COMMISSIONER INGLEE:**  This
10 Hearing is being conducted pursuant to Penal
11 Code Sections 3041 and 3042, and the Rules and
12 Regulations of the Board of Prison Terms
13 governing Parole Consideration Hearings for life
14 inmates.  Is he understanding me?
15       **INMATE DANG THROUGH INTERPRETER:**  Yes, I
16 understand.
17       **PRESIDING COMMISSIONER INGLEE:**  Okay.
18       **INMATE DANG THROUGH INTERPRETER:**  No
19 problem.
20       **PRESIDING COMMISSIONER INGLEE:**  Because I
21 want to be sure that he understands what I'm
22 saying because I don't think you're interpreting
23 for him.
24       **INTERPRETER MEIN:**  Yeah.
25       **PRESIDING COMMISSIONER INGLEE:**  And I
26 don't want to find out --
27       **INTERPRETER MEIN:**  I got it.

8

1    **PRESIDING COMMISSIONER INGLEE:** -- after

2    the meeting is over that he didn't understand

3    what we were saying.

4    **INMATE DANG THROUGH INTERPRETER:** Yeah.

5    **PRESIDING COMMISSIONER INGLEE:** Okay, the

6    purpose of today's Hearing is to consider your

7    suitability for parole. In doing so we will

8    consider the number and nature of the crimes

9    that you were committed for, your prior criminal

10    and social history and your behavior and

11    programming since your commitment. We have had

12    the opportunity to review your Central File and

13    you will be given an opportunity to correct or

14    clarify the record. We will consider your

15    progress since your commitment your counselor's

16    report and psychological report. And any change

17    in your parole plans should be brought to our

18    attention. We will reach a decision today and

19    inform you whether or not we find you suitable

20    for parole and the reasons for our decision. If

21    you are found suitable for parole the length of

22    your confinement will be explained to you.

23    Before we go any further I want to advise you

24    that we expect you to totally be honest with us

25    today. If you do not get a date today, this

26    Hearing will form a foundation for all future

27    Hearings. If you do not get a date today, any

9

1    false information that you would give us will

2    have an adverse affect on your ability to get a

3    date in the future.  Nothing that happens here

4    today will change the finding of the Court.  We

5    are not here to retry your case.  We are here

6    for the sole purpose of determining your

7    suitability for parole.  Do you understand that?

8            **INTERPRETER MEIN:**  I do.

9            **PRESIDING COMMISSIONER INGLEE:**  This

10   Hearing is going to be conducted in two phases:

11   I will discuss with you the crimes that you were

12   committed for, your prior criminal and social

13   history, your parole plans and any letters of

14   support or opposition that may be in the file.

15   Deputy Commissioner Moore will discuss with you

16   your progress since your commitment, your

17   counselor's report and your psychological

18   evaluation.  Once that is concluded the

19   Commissioners, the District Attorney and your

20   Attorney will be given an opportunity to ask you

21   questions.  The questions from the District

22   Attorney shall be asked through the Chair, and

23   your answers shall be directed to the Panel.  He

24   is not to talk to the District Attorney.  Any

25   answers that he has will be directed either

26   directly to me or through your interpreter to me

27   or to Deputy Commissioner Moore or myself.  The

10

1   Hearing will be -- excuse me.  Once that is

2   concluded the Commissioners, the District

3   Attorney and your Attorney and you will be given

4   -- I've already said that.  Let me go down

5   further.  Before we recess for deliberations the

6   District Attorney, your Attorney will be given

7   an opportunity to make a final statement

8   regarding your parole suitability.  Your

9   statement that you make should be directed to

10  why you feel that you are suitable for parole.

11  Once we have completed our deliberations we will

12  resume the Hearing and announce our decisions.

13  The California Code of Regulations states that

14  regardless of time served, a life inmate shall

15  be found unsuitable for and denied parole if, in

16  the judgment of the Panel, the inmate would pose

17  an unreasonable risk of danger to society if

18  released from prison.  You have certain rights.

19  These rights include:  the right of a timely

20  notice of this Hearing; the right to review your

21  Central File; the right to present relevant

22  documents.  Counsel, are you satisfied that your

23  client's rights have been met in this regard?

24      **ATTORNEY LEWIS:**  Yes, they have.

25      **PRESIDING COMMISSIONER INGLEE:**  You also

26  have the right to be heard by an impartial

27  Panel.  Mr. Dang, do you object to either member

11

1   of this Panel?

2         INMATE DANG THROUGH INTERPRETER:  No.

3         PRESIDING COMMISSIONER INGLEE:  What was

4   his answer?

5         INMATE DANG THROUGH INTERPRETER:  No.

6         PRESIDING COMMISSIONER INGLEE:  No

7   objection.  Okay.

8         INMATE DANG THROUGH INTERPRETER:  He

9   doesn't speak up right now.

10        PRESIDING COMMISSIONER INGLEE:

11  Counselor, do you have any objection to any

12  member of this Panel?

13        ATTORNEY LEWIS:  No, I do not.

14        PRESIDING COMMISSIONER INGLEE:  You will

15  receive a written copy of the tentative decision

16  today.  That decision is subject to review by

17  the Decision Review Unit and by the entire Panel

18  meeting as a Body.  It will become effective

19  within 120 days.  It is also subject to review

20  by the Governor.  A copy of the decision and a

21  copy of the transcript will be sent to you.  As

22  of May 2004 there were major changes limited

23  your former rights to appeal for decision or

24  actions directed to the Board.  The old Board

25  regulations were repealed.  The current policy

26  is entitled Administrative Appeals,

27  Correspondence, and Grievances Concerning Board

12

1    of Prison Terms Decisions, and it is available

2    in the prison law library for your review.

3    You are not required to admit your offense or

4    discuss your offense if you do not wish to do

5    so.  However, this Panel does accept as true the

6    findings of the Court, and you are invited to

7    discuss the facts and circumstances of the

8    offense if you desire.  The Board will review

9    and consider any prior statements that you have

10   made regarding the offense in determining your

11   suitability for parole.  Deputy Commissioner

12   Moore, is there any confidential material in the

13   file?  And if so will it be used today?

14        **DEPUTY COMMISSIONER MOORE:**  No, there is

15   no material.

16        **PRESIDING COMMISSIONER INGLEE:**  I have

17   passed the Hearing checklist, marked Exhibit

18   One, to your attorney.  Did the district

19   attorney also have a chance to review that?

20        **DEPUTY DISTRICT ATTORNEY BULLOCH:**  I have

21   see the checklist and I have all the documents.

22        **PRESIDING COMMISSIONER INGLEE:**  All

23   right.  Counsel, do you have all your documents?

24        **ATTORNEY LEWIS:**  Yes, I do.

25        **PRESIDING COMMISSIONER INGLEE:**  Thank

26   you.  Are there any additional documents to be

27   submitted today?

13

1          **ATTORNEY LEWIS:**  None.

2          **PRESIDING COMMISSIONER INGLEE:**  All

3    right.  Are there any preliminary objects for

4    the Hearing?

5          **ATTORNEY LEWIS:**  No.

6          **PRESIDING COMMISSIONER INGLEE:**  Will the

7    inmate be speaking to the Panel?

8          **ATTORNEY LEWIS:**  Yes.

9          **PRESIDING COMMISSIONER INGLEE:**  On all

10    subjects?

11          **ATTORNEY LEWIS:**  Yes.

12          **PRESIDING COMMISSIONER INGLEE:**  All

13    right.  Would you please ask Mr. Dang to raise

14    his right hand.  Tell him he is going to be

15    sworn in now.  Do you solemnly swear or affirm

16    that the testimony you give at this Hearing will

17    be the truth, the whole truth and nothing but

18    the truth?

19          **INMATE DANG THROUGH INTERPRETER:**  I do.

20          **PRESIDING COMMISSIONER INGLEE:**  You do.

21    Thank you.

22          **INTERPRETER MEIN:**  I him to raise his

23    voice a bit so we can hear.

24          **PRESIDING COMMISSIONER INGLEE:**  As this

25    is your first or your Initial Hearing, we will

26    be reading the Statement of Facts into the

27    record.

14

1        **INMATE DANG THROUGH INTERPRETER:**  Yes.

2        **PRESIDING COMMISSIONER INGLEE:**   The

3    Statement of Facts will be coming from the Court

4    of Appeal, Fourth District, and it will be pages

5    five through eight, starting on the paragraph of

6    Facts:

7            Jose Lopez [phonetic] and his wife

8            Wanpeth --And I'll spell the last

9            and first name, W-A-N-P-E-T-H,

10           Campbell, C-A-M-P-B-E-L-L, held a

11           party at their home, hereafter

12           referred to as the Lopez house, in

13           Highland, in the evening of

14           September 6, 1991.  Some of those

15           present were gambling.  At about

16           11:30 P.M., four or five Asian men

17           approached the Lopez outside and

18           forced him into the house.  One of

19           the men held a gun to his head.

20           The seventeen victims of the

21           residential robbery and the

22           assaultants were rounded up and

23           order to lie face down on the

24           floor, and with the exception of

25           the two assault victims were

26           robbed of money and jewelry.

27   Is Mr. Dang receiving -- is he --

15

1         **INMATE DANG THROUGH INTERPRETER:**  Yeah.

2         **PRESIDING COMMISSIONER INGLEE:**  Be sure

3  he understands what we're saying on this.

4         **INMATE DANG THROUGH INTERPRETER:**  Yeah.

5         **PRESIDING COMMISSIONER INGLEE:**

6         Several of the victims testified

7         that all of the robbers carried

8         guns.  Some of the victims heard

9         the robbers speak in what the

10        victims believed was Vietnamese,

11        although the robbers issued orders

12        in English.  None of the guests at

13        the gathering were Vietnamese.  At

14        least one of the robbers wore a

15        handkerchief or cloth over his

16        face.  The robbers pulled out

17        telephone wires before they left

18        through the backdoor.  After the

19        robbers left --

20         **DEPUTY COMMISSIONER MOORE:**  If I may

21  request a break for myself before we continued.

22  I need to use the --

23         **PRESIDING COMMISSIONER INGLEE:**

24  Certainly.

25         **DEPUTY COMMISSIONER MOORE:**  It's

26  9:00 o'clock and we'll go on break.

27         **PRESIDING COMMISSIONER INGLEE:**  We are

16

1   going to take a short recess.

2                       (Off Record)

3           **DEPUTY COMMISSIONER MOORE:**  We're on

4   record at 9:12.

5           **PRESIDING COMMISSIONER INGLEE:**  All

6   right, we had a recess and during the recess we

7   have had some discussion concerning the

8   translations that are going on here at this

9   time.  And I'm not satisfied that we are being

10  able to correctly go from English to Vietnamese

11  and then from Vietnamese to English so that

12  everybody understands what's being said.  So

13  what we have decided is because you speak, you

14  speak conversational English, I'm going to

15  continue to read and discuss the case in

16  English.  If you do not understands something,

17  then you just tell your translator that you

18  don't understand it and he will translate it for

19  you.  When you speak you can speak in Vietnamese

20  and the translator will tell us what you are

21  saying in English.

22          **INMATE DANG:**  Yes, sir.

23          **PRESIDING COMMISSIONER INGLEE:**  All

24  right.  Now --

25          **INMATE DANG:**  Yes, sir.

26          **PRESIDING COMMISSIONER INGLEE:**   -- is

27  that going to be okay?

17

1          INMATE DANG:  Yes, yes.

2          PRESIDING COMMISSIONER INGLEE:  Counsel,

3     is this okay with you?

4          ATTORNEY LEWIS:  Yes.

5          PRESIDING COMMISSIONER INGLEE:  If you

6     have any problems, as I said before, talk to

7     your translator.  If you have any concerns about

8     the Hearing in any way, shape, or form, then

9     speak to your attorney.  Okay?

10          INMATE DANG:  Yes, sir.

11          PRESIDING COMMISSIONER INGLEE:  All

12     right.  And don't, please, don't say yes, sir,

13     to me only because you're an inmate and I'm the

14     Commissioner.  We want to be sure that you

15     understand what is being said here today.

16          INMATE DANG:  I understood.

17          PRESIDING COMMISSIONER INGLEE:  Okay.

18          INMATE DANG:  Yes, sir.

19          PRESIDING COMMISSIONER INGLEE:  All

20     right.  Now this is not the time just to say yes

21     just for the sake of saying yes.

22          INMATE DANG:  I know.

23          PRESIDING COMMISSIONER INGLEE:  You need

24     to tell us directly and honestly whether you are

25     understanding what is going on.

26          INMATE DANG:  Yes, sir.

27          PRESIDING COMMISSIONER INGLEE:  Let's

18

1    move forward then.  And we will start -- we will

2    go back and start over again in reading the

3    Facts into the record of this specific case.

4    Again, this comes from the Appellate Decision,

5    and it starts on Page three.

6                Jose Lopez and his wife Wanpeth,

7                And that's spelled W-A-N-P-E-T-H,

8                Campbell, held a party at their

9                home, hereafter referred to as

10               the Lopez house, in Highland.  In

11               the evening of September 6, 1991,

12               some of those present were

13               gambling.  At about 11:30 P.M.,

14               four or five Asian men approached

15               Lopez outside and forced him into

16               the house.  One of the men held a

17               gun to his head.  The seventeen

18               victims of the residential

19               robbery and assaultants were

20               rounded up and ordered to lie

21               face down on the floor, and with

22               the exception of the two assault

23               victims were robbed of money and

24               jewelry.

25    All right, I'm going to stop for one second.

26    Mr. Dang, are you understanding what I'm saying?

27               **INMATE DANG:**  Yes, sir.

19

```
 1          PRESIDING COMMISSIONER INGLEE:    All
 2   right.
 3               Several of the victims testified
 4               that all of the robbers carried
 5               guns.  Some of the victims heard
 6               the robbers speaking in what the
 7               victims believed was Vietnamese,
 8               although the robbers issued orders
 9               in English.  None of the guest at
10               the gathering was Vietnamese.  At
11               least one of the robbers wore a
12               handkerchief or cloth over his
13               face.  The robbers pulled out the
14               telephone wires before they left
15               through the backdoor.  After the
16               robbers left several of the victims
17               heard one or two gunshots from
18               outside the house.  A Highland
19               resident testified that around
20               midnight that night she heard two
21               gunshots.  She saw three men near
22               her fence and one appeared to have
23               a gun.  One of the men appeared to
24               be hurt.  The blood was found later
25               in the area.  However, none of the
26               five persons later arrested had
27               been injured.  A Highland resident,
```

20

1   James Gibbons, G-I-B-B-O-N-S,

2   testified that late that night he

3   saw two Asian men running down

4   Grave [phonetic] Street towards

5   Sixth Street.  One of the men was

6   wearing a red shirt and he threw

7   away what appeared to be a gun.

8   Gibbons followed the man in a car

9   and saw that a few minutes later at

10  a market the man in the red shirt

11  was throwing money size papers into

12  a trashcan.  They other man helped

13  pick up some of the papers that had

14  fallen on the ground instead of

15  into the trashcan.  Later officers

16  found a Uzi-type gun-clip in the

17  area where Gibbons had seen the

18  items thrown.  Chu, and that's

19  spelled C-H-U, was wearing a red

20  shirt and beige pants, was arrested

21  with Trinh, which is spelled

22  T-R-I-N-H, at the market.  Chu was

23  making a telephone call when the

24  police arrived.  The trashcan

25  nearby contained U.S. and other

26  currency, including Vietnamese,

27  Australian, Singapore, Philippine,

21

1  and Japanese monies.  Chu gave a

2  false name when he was arrested.

3  At the field show up later that

4  night, Gibbons identified Chu as

5  the man in the red shirt who had

6  thrown something away.  Meanwhile,

7  Dang, again spelled D-A-N-G, Sau,

8  spelled S-A-U, and Huan N, H-U-A-N,

9  and then a capital N, accosted

10  Louis [phonetic] Salazar,

11  S-A-L-A-Z-A-R, and his girlfriend

12  Rhonda [phonetic] Bird [phonetic],

13  a few blocks from the Lopez house.

14  Bird had been sitting in Salazar's

15  car outside the Salazar house.

16  Just as Salazar was coming out of

17  the house, Dang and Huan N

18  approached saying that they needed

19  help because somebody was after

20  them.  Huan N pulled a gun on

21  Salazar and ordered Bird to unlock

22  the car.  Huan N told Salazar to

23  get out of the car.  Huan N got in

24  the front passenger seat, Salazar

25  got in the driver's seat, Dang got

26  in the backseat, and Bird jumped

27  out.  Sau then approached and Dang

22

1    ordered Bird to get back in the

2    car.  Bird sat of Salazar's lap in

3    the driver's seat, and Sau got in

4    the backseat.  Because Salazar

5    could not then drive, the men

6    ordered Bird out of the car.  At

7    one point Huan N struck Salazar

8    with the gun.  Salazar later had

9    some swelling around his eyebrow.

10    They ordered Salazar to drive to

11    the freeway.  About a quarter a

12    mile away Dang said to stop the car

13    and the men ordered Salazar to get

14    out.  Police officers stopped the

15    car just before midnight because

16    Sau, who was driving, had been

17    speeding and made three lane

18    changes without signaling.  Sau

19    said he had no driver's license and

20    gave a false name to the officers.

21    Officers found a large amount of

22    currency in the car and found about

23    twelve hundred dollars in cash,

24    surgical gloves and jewelry behind

25    the bush near the car.  The victims

26    identified the jewelry as having

27    been taken from them during the

23

1    robbery.  The police found a

2    handgun on the street where the

3    stolen car had been and they found

4    a pair of shoes, a handgun, two

5    purses, and a stungun in the Lopez

6    yard.  A sock was found on the

7    fence directly behind the Lopez

8    home.  And I'm going to spell this

9    first name, it is spelled

10   A-N-A-N-T-A-P-O-R-N, and the last

11   name is Field, F-I-E-L-D, testified

12   that his wallet had been stolen,

13   and that the wallet had contained

14   currency from Australia, Brunei,

15   Hong Kong, Japan, Singapore, and

16   the Philippines.  The Country

17   Brunei is spelled B-R-U-M-E-I.  Chu

18   was wearing a necklace with a

19   Buddha pendant when he was

20   arrested.  Field identified the

21   necklace as one that had been taken

22   from him during the robbery.  One

23   robbery victim testified in court

24   that Chu looked familiar, but the

25   witness was unable to identify Chu

26   at the preliminary hearing or at a

27   show up at the night of the

24

1          robbery.

2    Deputy Commissioner, I think we have completed

3    the actual Statement of Facts of the crime

4    itself, we are getting into the court case

5    itself, now, it's on page eight.  Counsel, are

6    you comfortable that we've gone through --

7          **ATTORNEY LEWIS:**  I would agree --

8          **PRESIDING COMMISSIONER INGLEE:**  -- the

9    Statement --

10         **ATTORNEY LEWIS:**  -- with you on that.

11   Yes, it's starting to get into the court case.

12         **PRESIDING COMMISSIONER INGLEE:**  Yeah, I

13   think what we're going to be doing is getting

14   into testimony and I don't think that's

15   appropriate for the Statement of Facts.

16         **ATTORNEY LEWIS:**  I agree.

17         **PRESIDING COMMISSIONER INGLEE:**  They

18   don't have this as well organized as some

19   appellates that I have read.  All right, now

20   we're going to as Mr. Dang to tell us, number

21   one, do you agree with what was just read in

22   your participation in this crime?

23         **INMATE DANG:**  Yes, sir.

24         **PRESIDING COMMISSIONER INGLEE:**  Two:

25   Would you tell us in your own words what you did

26   during this crime?  You'll be speaking through

27   the interpreter.

1    **INMATE DANG THROUGH INTERPRETER:**  At that

2    time, I just got to the United States.

3    **DEPUTY COMMISSIONER MOORE:**  Could you

4    move the microphone closer to you?  Thank you.

5    **INTERPRETER MEIN:**  Sorry.

6    **INMATE DANG THROUGH INTERPRETER:**  I went

7    to school and then really the friends influence

8    me.  I thought -- okay, when I was young I just,

9    you know, running around.  And the friends

10   suggest to me the wrong thing.  They asked me to

11   go with them for the robbery.  I, at that time,

12   I was young so I don't have, you know, really a

13   right thinking.  I agree with them, because I

14   get along with friends, made friends by

15   listening to them.  I couldn't, you know, really

16   judge which is right, which is wrong, therefore,

17   I am very sorry for whatever I did.  But I am

18   responsible for whatever I did.

19   **PRESIDING COMMISSIONER INGLEE:**  I would

20   like to have Mr. Dang tell us specifically what

21   did you do during the crime.

22   **INMATE DANG THROUGH INTERPRETER:**  In the

23   robbery my friends have guns; I don't have gun.

24   They point the gun and order the other people to

25   lie down.  I go and collect money and jewelries.

26   After that we intend to leave and somebody shout

27   out that the police are coming.  I scare so I

26

1    run away or left the scene.  Therefore I came to

2    the car where they hold the other people; they

3    already hold them, hold up the people.  At that

4    point I scared to death so I just jump in the

5    car; try to escape, I only thinking of escaping

6    the scene, that's all.  The fact that in the

7    statement say that I ordered the girl to get

8    back into the car I didn't do that; I only know

9    that I jump in the backseat of the car, and

10   after the car running.  I saw that's wrong

11   that's why I asked my friend to let go of the

12   girl.  Okay, since the car left the scene I

13   realize that I make the second mistake; I did it

14   wrong twice.  It's already late, that's why I

15   asked them to let go, let the girl go.  I'm

16   sorry, that's the boy who drive the car, not the

17   girl.

18          **PRESIDING COMMISSIONER INGLEE:**  Did he --

19   did you at any time have a weapon?

20          **INMATE DANG:**  No.

21          **PRESIDING COMMISSIONER INGLEE:**  Did you

22   at any time pick up cash or jewelry?

23          **INMATE DANG:**  Yes, sir.

24          **PRESIDING COMMISSIONER INGLEE:**  What did

25   you do with the cash and jewelry after you

26   picked it up?

27          **INMATE DANG THROUGH INTERPRETER:**  Okay,

27

1    when the police stop me I put the money in the

2    bush, not much, because the police didn't, you

3    know, check carefully so I have time to do that.

4         PRESIDING COMMISSIONER INGLEE:  Did you

5    retain any -- did you keep any of the money for

6    yourself?

7         INMATE DANG:  No.

8         PRESIDING COMMISSIONER INGLEE:  No?

9         INMATE DANG THROUGH INTERPRETER:  No.

10         PRESIDING COMMISSIONER INGLEE:  Deputy

11   Commissioner, do you have any questions?

12         DEPUTY COMMISSIONER MOORE:  Yes.  Which

13   happened first:  the car robbery or the house

14   robbery?

15         INMATE DANG THROUGH INTERPRETER:  The

16   house robbery.

17         DEPUTY COMMISSIONER MOORE:  Okay.  And

18   how many people were in the house and robbed?

19         INMATE DANG THROUGH INTERPRETER:  When

20   went into the home there were four.

21         DEPUTY COMMISSIONER MOORE:  Four.  How

22   many guns were there in the house that you saw?

23         INMATE DANG THROUGH INTERPRETER:  I don't

24   remember very clearly, could be two guns.

25         DEPUTY COMMISSIONER MOORE:  Why did you

26   go into the house?

27         INMATE DANG THROUGH INTERPRETER:  At that

28

1  point I just follow my friend.  I want to make

2  friends.  I don't think very much and they asked

3  me to come in; I come in.

4      DEPUTY COMMISSIONER MOORE:  Did you see

5  the guns before you went into the house?

6      INMATE DANG THROUGH INTERPRETER:  Yes.

7      DEPUTY COMMISSIONER MOORE:  You knew they

8  were going to do a robbery?

9      INMATE DANG:  Yes.

10     DEPUTY COMMISSIONER MOORE:  Today do you

11 think you did anything wrong in that house?

12     INMATE DANG:  Yes.

13     DEPUTY COMMISSIONER MOORE:  What?

14     INMATE DANG THROUGH INTERPRETER:  Robbery

15 is wrong, completely wrong.  Right at the moment

16 that I followed to that I feel it's wrong

17 already.

18     DEPUTY COMMISSIONER MOORE:  Did your

19 friends put guns to the victims' heads?

20     INMATE DANG THROUGH INTERPRETER:  Yes.

21     DEPUTY COMMISSIONER MOORE:  How many

22 victims did you take money and jewelry from?

23     INMATE DANG THROUGH INTERPRETER:  I don't

24 remember exactly.

25     DEPUTY COMMISSIONER MOORE:  More than

26 one?

27     INMATE DANG:  Yes.

29

1    DEPUTY COMMISSIONER MOORE:  Did you say

2 anything while you were taking the money and

3 jewelry?

4    INMATE DANG THROUGH INTERPRETER:  I don't

5 remember, too long ago, 14 years ago.

6    DEPUTY COMMISSIONER MOORE:  Did anyone

7 get hurt during the robbery in the house?

8    INMATE DANG THROUGH INTERPRETER:  I think

9 nobody got hurt.

10    DEPUTY COMMISSIONER MOORE:  How long

11 after the house robbery did you get in the car?

12    INMATE DANG THROUGH INTERPRETER:  It

13 could be from three to five minutes.  AT that

14 point I was so scared I couldn't think about the

15 exact time.

16    DEPUTY COMMISSIONER MOORE:  What were you

17 afraid of?  What were you scared of?

18    INMATE DANG THROUGH INTERPRETER:  Police.

19    DEPUTY COMMISSIONER MOORE:  Of getting

20 caught?

21    INMATE DANG:  Yes, ma'am.

22    DEPUTY COMMISSIONER MOORE:  You weren't

23 afraid of your friends?

24    INMATE DANG THROUGH INTERPRETER:  No, I'm

25 not afraid of my friends.

26    DEPUTY COMMISSIONER MOORE:  How was the

27 car stopped?

30

1　　　　**INMATE DANG THROUGH INTERPRETER:**  The

2  police stopped the car.

3　　　　**DEPUTY COMMISSIONER MOORE:**  When you got

4  in the car, describe how you and your friends

5  got in the car.

6　　　　**INMATE DANG THROUGH INTERPRETER:**  At the

7  time I ran from the house where we robbed, those

8  my friend already point a gun at the victim.

9  And I know that they was waiting for me so I

10  jumped in the car to escape.

11　　　　**DEPUTY COMMISSIONER MOORE:**  How many guns

12  in the car?

13　　　　**INMATE DANG THROUGH INTERPRETER:**  One.

14　　　　**DEPUTY COMMISSIONER MOORE:**  And what did

15  you friend do with the gun?

16　　　　**INMATE DANG THROUGH INTERPRETER:**  I think

17  they throw the gun away.

18　　　　**DEPUTY COMMISSIONER MOORE:**  In the car

19  with the victim, what did your friend with the

20  gun?

21　　　　**INMATE DANG THROUGH INTERPRETER:**  They

22  point the gun at the driver.

23　　　　**DEPUTY COMMISSIONER MOORE:**  Did he hit

24  the driver with the gun?

25　　　　**INMATE DANG THROUGH INTERPRETER:**  That I

26  don't remember.

27　　　　**DEPUTY COMMISSIONER MOORE:**  How many

31

1  victims were in the car?

2        **INMATE DANG THROUGH INTERPRETER:**  I

3  remember only one victim.

4        **DEPUTY COMMISSIONER MOORE:**  Male or

5  female?

6        **INMATE DANG THROUGH INTERPRETER:**  Male.

7        **DEPUTY COMMISSIONER MOORE:**  Was there

8  ever a female in the car?

9        **INMATE DANG THROUGH INTERPRETER:**  Yes.

10        **DEPUTY COMMISSIONER MOORE:**  What happened

11  to her?

12        **INMATE DANG THROUGH INTERPRETER:**  It

13  happened to fast I don't remember.  When I jump

14  in the car the car speed off at the same time.

15  So it's so fast I don't remember.

16        **DEPUTY COMMISSIONER MOORE:**  Was the girl

17  in the car when you sped off?

18        **INMATE DANG THROUGH INTERPRETER:**  No.

19        **DEPUTY COMMISSIONER MOORE:**  Did you or

20  your friends tell the male driver:  "Take us out

21  of here or I'll kill you"?

22        **INMATE DANG THROUGH INTERPRETER:**  I did

23  hear that order, but I'm not the one who said

24  that.

25        **DEPUTY COMMISSIONER MOORE:**  Where were

26  you sitting in the car?

27        **INMATE DANG THROUGH INTERPRETER:**  In the

32

1  backseat.

2      DEPUTY COMMISSIONER MOORE:  Who told the

3  driver:  "Drive faster or I'll kill you.  Take

4  us to the nearest freeway"?

5      INMATE DANG THROUGH INTERPRETER:  I don't

6  remember very clearly, but it could be the one

7  who has the gun at that time, point in time.

8      DEPUTY COMMISSIONER MOORE:  And the one

9  who had the gun was a member of the Black Dragon

10  Gang?

11      INMATE DANG THROUGH INTERPRETER:  I don't

12  know.

13      DEPUTY COMMISSIONER MOORE:  Which one of

14  the people in the car or the house robbery were

15  part of the Black Dragon Gang?

16      INMATE DANG THROUGH INTERPRETER:  I don't

17  know.

18      DEPUTY COMMISSIONER MOORE:  Who drove the

19  car after the victim was kicked out of the car?

20      INMATE DANG THROUGH INTERPRETER:  Oh, the

21  person named Sau.

22      DEPUTY COMMISSIONER MOORE:  Did you stay

23  in the backseat?

24      INMATE DANG:  Yes.

25      DEPUTY COMMISSIONER MOORE:  During that

26  whole night, from the house robbery to taking

27  the car and kidnapping the driver, did anyone

33

1   shoot a gun?

2        **INMATE DANG THROUGH INTERPRETER:** I don't

3   know during that whole night.

4        **DEPUTY COMMISSIONER MOORE:** Did you hear

5   a gunshot?

6                  (TAPE 1, SIDE A, ENDS)

7                  (TAPE 1, SIDE B, BEGINS)

8        **DEPUTY COMMISSIONER MOORE:** We're on side

9   two, at 9:38. Did you ever tell anyone from the

10  police or probation that your friends were

11  members of the Black Dragon Gang?

12       **INMATE DANG THROUGH INTERPRETER:** Okay,

13  after it got on the news, on the paper, then I

14  did tell the people.

15       **DEPUTY COMMISSIONER MOORE:** Which people?

16       **INMATE DANG THROUGH INTERPRETER:** The

17  probation officer. Okay, I didn't know that,

18  but after I read the paper then I know that they

19  belong to that gang.

20       **DEPUTY COMMISSIONER MOORE:** Thank you.

21  I'm done.

22       **PRESIDING COMMISSIONER INGLEE:** I want to

23  follow up a little bit on what the Deputy

24  Commissioner was saying, and go over a couple of

25  items in the Appellate Decision in this regard.

26  I want to be sure we understand part of what

27  Mr. Dang's participation was. In the Appellate

34

1    Decision, it's page six, it says:

2            Huan N pulled a gun on Salazar and

3            ordered Bird, and that's Rhonda

4            Bird, female --

5        **INTERPRETER MEIN:**  Could you please, he

6    wanted you to speak a little bit louder.

7        **PRESIDING COMMISSIONER INGLEE:**    All

8    right.

9            Huan N pulled a gun on Salazar and

10           ordered Bird, that being a female,

11           Rhonda Bird, to unlock the car.

12           Huan N told Salazar to get out of

13           the car.  Huan N got in the front

14           passenger seat, Salazar got in the

15           driver's seat, Dang got in the

16           backseat, Bird, that's the female,

17           jumped out.  Sau then approached

18           and Dang ordered Bird, the female,

19           to get back in the car.  Bird sat

20           on Salazar's lap in the driver's

21           seat and Sau got in the backseat.

22           Because Salazar could not drive,

23           the men ordered Bird out of the

24           car.  At one point Huan N struck

25           Salazar with the gun.  Salazar

26           later had a swelling above his

27           eyes.

35

1   What my reason for reading this is, is that

2   there was questions and I'm not sure if they

3   were answered as the Deputy Commissioner was

4   speaking.  But, yes, there was female in the car

5   for part of the time, and somebody was stuck and

6   that's Salazar, and he apparently was stuck on

7   the forehead or around the eye area.

8       **DEPUTY COMMISSIONER MOORE:**  There's

9   counsel --

10      **ATTORNEY LEWIS:**  Yeah he has --

11      **PRESIDING COMMISSIONER INGLEE:**  Yes,

12  please.

13      **INMATE DANG THROUGH INTERPRETER:**  Because

14  I come later, so the thing happened; I didn't

15  know.  When is the gun to hit the man and when

16  whatever happened the girl, I don't know.

17      **PRESIDING COMMISSIONER INGLEE:**  All

18  right.  Is there anything else, Mr. Dang, that

19  you would like to say concerning the crime?

20      **INMATE DANG THROUGH INTERPRETER:**  Yes.  I

21  very sorry for what I did.  I responsible for

22  whatever I did.  I am responsibility and I was

23  young.  Okay, if I can retrieve whatever I did

24  since we were young, I willing to do.

25      **PRESIDING COMMISSIONER INGLEE:**  All

26  right.  Counsel, is there anything you would

27  like to discuss concerning the crime before we

1  move on?

2      **ATTORNEY LEWIS:**  I would like to ask my

3  client some questions with regards to that, to

4  the crime.

5      **PRESIDING COMMISSIONER INGLEE:**  Well,

6  there is a point of questioning.  Is that the

7  kind of questions you're going to ask, sir?  Or

8  do you want to try to have him elaborate on the

9  crime itself?

10      **ATTORNEY LEWIS:**  I don't want him to

11  elaborate on the crime.  I just want to ask him

12  some specific questions when that time comes.

13      **PRESIDING COMMISSIONER INGLEE:**  All

14  right.  You'll have more than an opportunity to

15  do that.

16      **ATTORNEY LEWIS:**  Thank you.  Let's move

17  on then, if there are no further commits that

18  Mr. Dang has, then we will move on.  Okay?  Do

19  you understand?

20      **INMATE DANG:**  Yes.

21      **PRESIDING COMMISSIONER INGLEE:**  All

22  right, good.  But don't hesitate.  If you have

23  more to say about the crime, let us know.  All

24  right, we're going to move on now to your

25  criminal record.  You have no juvenile record

26  and you have no adult convictions.  The incident

27  offense, which you are currently in prison for,

1   was your first reported arrest.

2           **INMATE DANG:**  Yes.

3           **PRESIDING COMMISSIONER INGLEE:**  Let's

4   move on then to your personal factors.  Dang was

5   born in Vietnam on 4/27/1972.  Mr. Dang, when

6   did you come to the United States?

7           **INMATE DANG THROUGH INTERPRETER:**  '87.

8           **PRESIDING COMMISSIONER INGLEE:**  '87.  So

9   it was considerably after the change of

10  government there.  Okay.  "About five years

11  prior to the crime he left Vietnam and lived

12  with his father in Hawaii for about one month.

13  He then came to California to live with his

14  aunt.  He came to California so he could attend

15  school.  He worked part-time in the Montebello

16  City Parks and Recreation Program.  He

17  occasionally performed job duties at the City

18. Hall.  He denies any past drug or alcohol

19  abuse."  Did you drink alcohol at all?

20          **INMATE DANG THROUGH INTERPRETER:**  Okay, I

21  do drink alcohol, but not on a regular basis.

22  When we have a party and things like that.

23          **PRESIDING COMMISSIONER INGLEE:**  What

24  about narcotics, drugs?

25          **INMATE DANG THROUGH INTERPRETER:**  No, I

26  hate that.

27          **PRESIDING COMMISSIONER INGLEE:**  Were you

1   a member of a Vietnamese gang?

2          INMATE DANG THROUGH INTERPRETER:  No.

3          PRESIDING COMMISSIONER INGLEE:  Were you

4   a member of the Black Dragon Gang?

5          INMATE DANG:  No.

6          PRESIDING COMMISSIONER INGLEE:  Do you

7   have any tattoos?

8          INMATE DANG:  No.

9          PRESIDING COMMISSIONER INGLEE:  No

10  tattoos at all?

11              (No audible response)

12         PRESIDING COMMISSIONER INGLEE:  Was the

13  Black Dragon Gang, did that come from the former

14  South Vietnamese military?

15         INMATE DANG THROUGH INTERPRETER:  I don't

16  know.

17         PRESIDING COMMISSIONER INGLEE:  You have

18  a hold by the INS at this time.  Is that

19  correct?

20         INMATE DANG THROUGH INTERPRETER:

21  Correct.

22         PRESIDING COMMISSIONER INGLEE:  So if you

23  were paroled and if there was a -- if you were

24  able to do so, you then would be deported to

25  Vietnam.  You understand that?

26         INMATE DANG:  Yes, sir.

27         PRESIDING COMMISSIONER INGLEE:  I doubt

39

1   at this moment if we have a Treaty for that

2   specific purpose, but because we have

3   strengthening relations between the two

4   countries, that maybe an issue at some time in

5   the future. But you do understand though that

6   you do have a hold by the INS?

7        INMATE DANG:  Yes, sir.

8        PRESIDING COMMISSIONER INGLEE:  All

9   right. Anything else about your personal life

10  or your family or anything that you would like

11  to discuss in regard to this crime?

12       INMATE DANG:  No.

13       PRESIDING COMMISSIONER INGLEE:  Is there

14  anything about your personal life that lead you

15  to this crime?

16       INMATE DANG:  No.

17       PRESIDING COMMISSIONER INGLEE:  All

18  right. Let's go on to your parole plans. Your

19  official plan at this time is to reside with

20  your brother, James Dang, and that's in Tustin,

21  California. Is that correct?

22       INMATE DANG:  Yes, sir.

23       PRESIDING COMMISSIONER INGLEE:  Is he

24  still living in Tustin, California?

25       INMATE DANG:  Yes, sir.

26       PRESIDING COMMISSIONER INGLEE:  You're

27  employment:  "Dang plans to work for his brother

40

1   James Dang at his beauty salon.  He will sweep

2   floor and wash hair until he gets his license to

3   cut hair."  Although it may not be well know, I

4   believe the licensing for hairdressing and that

5   type of service is fairly strict.  You may have

6   a problem as a person on parole to be able to

7   get a license at this time.  Do you understand

8   that?

9           INMATE DANG:  Yes, sir.

10          PRESIDING COMMISSIONER INGLEE:  That may

11  be a problem.  I'm not saying it is; I'm just

12  saying it may be a problem for you.  Certainly

13  you can sweep floor, and certainly you can be a

14  janitor.  But I'm talking about actually

15  participating in the activity of hairdressing,

16  barber and such; you have to be licensed.  And

17  that's something -- yes?

18          INMATE DANG THROUGH INTERPRETER:  The

19  reason, you know, since it was in the prison, I

20  do work as a hair, cutting, a hairdresser.

21          PRESIDING COMMISSIONER INGLEE:  Barber?

22          INMATE DANG THROUGH INTERPRETER:  Barber.

23  So I know a little bit, that's the only

24  experience that I have.

25          PRESIDING COMMISSIONER INGLEE:  Okay.

26  Well, I'm talking about the license, actually

27  being able to get a license --

41

1        **INMATE DANG:**  Yes.

2        **PRESIDING COMMISSIONER INGLEE:**  -- while

3   you're on parole.  I'm not sure about that, but

4   that is something that you need to consider.

5        **INMATE DANG:**  Yes.

6        **PRESIDING COMMISSIONER INGLEE:**  There may

7   be a problem.

8        **INMATE DANG:**  Yes, sir.

9        **PRESIDING COMMISSIONER INGLEE:**  All

10  right, let's take a look at your letters.  You

11  have support letters from your family.  You have

12  a letter from Dang Lan Duy, to spell the name

13  again, Dang, D-A-N-G, it's capital L-A-N,

14  capital D-U-Y, and that is your father.

15       **INMATE DANG:**  Yes, sir.

16       **PRESIDING COMMISSIONER INGLEE:**  All

17  right.  And he currently lives in Hawaii.  He

18  sends a very nice letter showing his support for

19  your parole.  You have a letter from Long T.

20  Dang, Long being spelled, capitol L-O-N-G,

21  capital T, middle initial, and then again the

22  last name Dang, and this is your aunt.  Is that

23  correct?

24       **INMATE DANG:**  Yes, sir.

25       **PRESIDING COMMISSIONER INGLEE:**  And she

26  lives in Mesquite, Texas?

27       **INMATE DANG:**  Yes, sir.

42

1     **PRESIDING COMMISSIONER INGLEE:**  Mesquite,

2  being spelled capital M-E-S-Q-I-T-E.  She says

3  that initially she was very angry at you.

4     **INMATE DANG THROUGH INTERPRETER:**  I made

5  all my family member very mad at me.  But when I

6  grew up in this environment and I wrote to them

7  and asked them to send this and they have send

8  letter to me.

9     **PRESIDING COMMISSIONER INGLEE:**  Well, I

10  hadn't finished the letter yet.  She initially

11  said she was mad at you.

12     **INMATE DANG:**  Yes.

13     **PRESIDING COMMISSIONER INGLEE:**  But she

14  has changed and she supports your parole.

15     **INMATE DANG:**  Yes, sir.

16     **PRESIDING COMMISSIONER INGLEE:**  Okay.

17  And again that's Long T. Dang.

18     **INMATE DANG:**  Yes, sir.

19     **PRESIDING COMMISSIONER INGLEE:**  We have a

20  letter from your brother.  His name is Huy Duy

21  Dang, and that's spelled capital H-U-Y, capital

22  D-U-Y, and again D-A-N-G.  And again, Mr. Dang,

23  I apologize for my terrible pronunciation of the

24  Vietnamese language, but you have to bear with

25  me on this.  This is your brother.  Does he live

26  in Tustin or Garden Grove?

27     **INMATE DANG:**  That's the same one,

43

1  Tustin, yes.

2      PRESIDING COMMISSIONER INGLEE:  Well, he

3  says:  "I am his brother.  I live in Garden

4  Grove and own an upscale beauty salon."

5      INMATE DANG THROUGH INTERPRETER:  It's in

6  Orange County.

7      PRESIDING COMMISSIONER INGLEE:  Oh, I

8  live in Orange County.  I know Tustin; I know

9  Garden Grove; I know Westminster; I know Little

10  Saigon.  I'm very familiar with it, but all I'm

11  saying is here, when you first referenced it you

12  say he lives in Tustin.

13      INMATE DANG:  Yes.

14      PRESIDING COMMISSIONER INGLEE:  But his

15  letter -- and it may be a very small point, but

16  he does say in his letter:  "I live in Garden

17  Grove," which is not far from Tustin.  But where

18  does he live?

19      INMATE DANG THROUGH INTERPRETER:  Okay,

20  the shop is in Tustin and the home residence is

21  in Garden Grove.

22      PRESIDING COMMISSIONER INGLEE:  All

23  right, so he lives in Garden Grove?

24      INMATE DANG:  Yes, sir.

25      PRESIDING COMMISSIONER INGLEE:  He works

26  in Tustin?

27      INMATE DANG:  Yes, sir.

44

1       **PRESIDING COMMISSIONER INGLEE:**  His

2  business is in Tustin?

3       **INMATE DANG:**  Yes, sir.

4       **PRESIDING COMMISSIONER INGLEE:**  All

5  right, he says throughout the up bringing you

6  have been very close.  You have expressed your

7  remorse over the incident that happened.  He

8  then says:  "Please take all these facts into

9  consideration when determining his suitability

10  for parole.  In addition he has a very

11  supportive family.  I will personally be

12  responsible for his emotional, financial well-

13  being.  I have offered him shelter in my

14  residence, as well as a stable job in my

15  business.  Further I know for a fact that when

16  his parole is granted he will be a model parolee

17  and productive member of society, I can

18  guarantee you.  I know the statistics for parole

19  return is high, please let my brother's story be

20  an successful one and a factor in reducing the

21  percentage of parolee returnees."  And that's

22  your brother.  So you would be living in Garden

23  Grove, California, and you would be working in

24  Tustin.

25       **INMATE DANG:**  Yes.

26       **PRESIDING COMMISSIONER INGLEE:**  All

27  right, is that going to be truly a full-time

45

1    job?

2          INMATE DANG:  Yes, sir.

3          PRESIDING COMMISSIONER INGLEE:   If you

4    cannot be a hairdresser initially, because you

5    may have a licensing problem, and that's

6    something that you need to consider, is there

7    going to be enough work for you to be able to be

8    supported by your brother until your parole

9    allows you to be licensed?

10          INMATE DANG:  Yes, sir.

11          PRESIDING COMMISSIONER INGLEE:   Because

12   as you probably know, if you receive a grant

13   today or at sometime in the future, and your

14   brother is still offering these services, of

15   course, the investigators will talk to your

16   brother to be sure that you do have a stable

17   real job, a stable real job.  Because he owns

18   probably a small shop, doesn't he?

19          INMATE DANG THROUGH INTERPRETER:  Ok, as

20   far as I hear from my brother he said that his

21   shop is pretty big and business is good.

22          PRESIDING COMMISSIONER INGLEE:  Okay, how

23   many chairs does he have in his shop?

24          INMATE DANG THROUGH INTERPRETER:   I

25   didn't ask him clearly.

26          PRESIDING COMMISSIONER INGLEE:  Okay.

27   All right, let's go on.  We have a letter here

46

1  from your sister and that is Phuong,

2  P-H-U-O-N-G, P. Dang.  And she sends you a very

3  supportive letter and she lives in San Antonio,

4  Texas.  And that's that.  All right, with that

5  we will now -- excuse me, I have one more thing

6  I must do and that is to talk about the 3042

7  letters.  These are letters that go out from the

8  prison to the various agencies that dealt with

9  your incarceration.  And in this regard they

10  sent out five letters to the police and court,

11  courts.  They were mailed on 4/14/2006.  We did

12  not receive a reply back; however, we have a

13  representative here from the San Bernardino

14  District Attorney's Office, who will make a

15  presentation in a few minutes.  With that I will

16  turn this, turn the Hearing over to the Deputy

17  Commissioner who will now go through the post-

18  conviction factors.

19       **DEPUTY COMMISSIONER MOORE:**  Mr. Dang, I'm

20  going to review with you what you've

21  accomplished since arriving in prison in 1992, I

22  believe is when you were, when you finally came

23  to prison.  Is that right?

24       **INMATE DANG:**  Yes.

25       **DEPUTY COMMISSIONER MOORE:**  Okay, and I'm

26  going to review with you what you've

27  accomplished in the past 14 years, almost 14

47

1  years.  And as I go through it I may have some

2  questions for you, and I may ask you for some

3  clarification.  So that's what my job is here

4  today.  You arrived here in Soledad at CTF in

5  October of 1998.

6          **INMATE DANG:**  Yes, ma'am.

7          **DEPUTY COMMISSIONER MOORE:**  And this is

8  your Initial Hearing.  You did have what they

9  call a document review in 2003, and it was

10  suggested that you become and remain

11  disciplinary free, no write ups; obtain positive

12  write ups, good write ups, chronos; that you

13  upgrade vocations, learn a trade; and that you

14  also upgrade educationally, but completing the

15  GED; and you participate in the psychological

16  report with the doctors.

17          **INMATE DANG:**  Yes.

18          **DEPUTY COMMISSIONER MOORE:**  That's what

19  was recommended in 2003.  Currently, your

20  classification score is the lowest that you can

21  get; it's a 19, and you obtained that score in

22  August of 2002.  You current custody level is at

23  Medium A, and you obtained that level in March

24  of 2000.  Your 812, which talks about gangs,

25  shows you as an associate of the Black Dragon

26  Gang, as a result of this incident.  There are

27  no write-ups of any other gang involvement since

48

1  you've been in prison.  Your current work

2  assignment is the Unit Porter.

3        **INMATE DANG:**  Yes.

4        **DEPUTY COMMISSIONER MOORE:**  And you've

5  been in that position since April of 2001, so

6  for five years now.

7        **INMATE DANG:**  Yes.

8        **DEPUTY COMMISSIONER MOORE:**  And you are

9  receiving above average evaluations in that

10  position.

11        **INMATE DANG:**  Yes.

12        **DEPUTY COMMISSIONER MOORE:**  Prior to

13  being a Unit Porter you worked in culinary, as

14  an apprentice cook?

15        **INMATE DANG:**  As a cook.

16        **DEPUTY COMMISSIONER MOORE:**  And you

17  received -- you worked in that position for

18  about one-year, and you received above average

19  and excellent reviews in that area.  You have

20  obtained your GED.  You obtained that here at

21  CTF in September of 2003.  Congratulations,

22  that's good work.  You're latest testing for

23  reading level grade placement showed at 9.6.

24  You currently have no vocational training, yet,

25  and no certificates, yet.  I did find in the

26  file that you had attended AA for two years in

27  '95 and '96.  You also in 2004, June of 2004,

49

1   completed the 13-Week Impact Workshop.

2          **INMATE DANG:**  Yes.

3          **DEPUTY COMMISSIONER MOORE:**  When you did

4   that workshop what did you learn from it?

5          **INMATE DANG THROUGH INTERPRETER:**  I

6   learned a lot during that time.  What I did to

7   the victims and the victim too and the family

8   member of the victim.  I leaned that that's very

9   wrong whatever we did.

10          **DEPUTY COMMISSIONER MOORE:**  What impact -

11   - what affect did you have, have you learned

12   that you had on your victims?

13          **INMATE DANG THROUGH INTERPRETER:**  If some

14   member of the family or they died they have to

15   suffer.  I hear that and I don't feel

16   comfortable myself.

17          **DEPUTY COMMISSIONER MOORE:**  What do the

18   victims suffer from?

19          **INMATE DANG THROUGH INTERPRETER:**  Yeah,

20   they lost the one that they love.

21          **DEPUTY COMMISSIONER MOORE:**  In your case,

22   what did the victims suffer from?  From what you

23   did.

24          **INMATE DANG THROUGH INTERPRETER:**  I think

25   we made them -- the main thing is the fear that

26   we create in them.

27          **DEPUTY COMMISSIONER MOORE:**  Okay.  I also

50

1    note in your record, in your file that you have

2    a, what we call a laudatory chrono, a very

3    positive chrono written in April of 2000 by

4    Supervising Cook I, and that was Choisnet,

5    C-H-O-I-S-N-E-T.  I may not be pronouncing it

6    right, but it was your supervisor when you were

7    a cook.  Indicating that in your work assignment

8    you were very positive and had a very good and

9    very good positive attitude.  In looking at your

10   disciplinary history, you have one 115 and that

11   was in July 1993, and that was at Lancaster for

12   disobeying a direct order; I believe it was

13   being told to stand for count and you refused.

14   The -- did you -- you look like you may have a

15   question about that?

16       INMATE DANG THROUGH INTERPRETER:  Okay,

17   in that incident I'm half awake, half asleep

18   that number one.  And number two, they call on

19   counting whatever unexpectedly so half of the

20   building people really don't know what's going

21   on.

22       DEPUTY COMMISSIONER MOORE:  Okay.  You

23   also have seven 128s, the last one occurring in

24   June of 1998, involving being absent from class

25   at Pleasant Valley State Prison.

26       INMATE DANG:  Yes.

27       DEPUTY COMMISSIONER MOORE:  In reviewing

51

1  your 128s, the next one was in May of '97 and it

2  was, again, not attending class, not feeling

3  well and not reporting; in March of '97, leaving

4  class early; in March of '94, not standing for

5  count prior to lockup; in March of '93, you went

6  to go pick up medication and you failed to

7  return to class, you spent time on the yard

8  talking, and that was in March of '93; in

9  October of '92, you didn't attend your education

10 school assignment for no noted reason; and in

11 September of '92, you couldn't stay awake in

12 class and you had been counseled several times.

13 So I would note that there are no violence, no

14 drugs or alcohol. And that there is a INS hold

15 on you at this time. Okay, I think that may

16 cover the Board Report, let me just double

17 check. I think at this time, is there anything

18 that you would like to add before I go to the

19 psychological report. Is there anything that I

20 missed or overlooked?

21          **INMATE DANG THROUGH INTERPRETER:** I feel

22 that they put it in that 128, it happened

23 because at that point in time I was not that

24 mature enough when I first got into jail. Since

25 the time a lot of thinking.

26          **DEPUTY COMMISSIONER MOORE:** Learning what

27 was expected of you.

52

1        **INMATE DANG THROUGH INTERPRETER:**  Okay,

2   now I've got older and more mature and I know my

3   responsibility.

4        **DEPUTY COMMISSIONER MOORE:**  Okay.  Now

5   I'm going to talk to you about what's in the

6   psychological evaluation that's dated May 8,

7   2006.  Do you remember meeting with the doctor?

8        **INMATE DANG:**  Yes.

9        **DEPUTY COMMISSIONER MOORE:**  Okay.  And

10  that was Dr. Lance Portnoff, P-O-R-T-N-O-F-F.

11  Also signing off on the report is Dr. Zika,

12  Z-I-K-A.  You indicated to the doctors that you

13  arrived in the United States at the age of 15

14  and at the time of the crime you were 19 years

15  old.  Is that right?

16       **INMATE DANG:**  Yes.

17       **DEPUTY COMMISSIONER MOORE:**  Okay.  You

18  completed the eleventh grade in the United

19  States before dropping out.  And as I've already

20  indicated you did obtain your GED while here at

21  CTF.  You indicated under Employment History,

22  that you are currently on multiple vocational

23  waiting lists.

24       **INMATE DANG:**  Yes.

25       **DEPUTY COMMISSIONER MOORE:**  Because you

26  wish to increase your vocational skills and

27  learn one.  Is that correct?

53

1          INMATE DANG:   Yes.

2          DEPUTY COMMISSIONER MOORE:   Which waiting

3    lists are you on?

4          INMATE DANG THROUGH INTERPRETER:   I sign

5    on all the programs.

6          DEPUTY COMMISSIONER MOORE:   Do you know

7    which ones?

8          INMATE DANG THROUGH INTERPRETER:   Print

9    shop and computer and because there are too many

10   people signing for that they don't have enough

11   room for me.

12         DEPUTY COMMISSIONER MOORE:   As you

13   indicated earlier, you deny ever using drugs, no

14   drugs and you deny abusing alcohol.   Did you

15   ever get drunk?

16         INMATE DANG THROUGH INTERPRETER:   Maybe

17   one time.

18         DEPUTY COMMISSIONER MOORE:   You also told

19   the doctor that you were attending Alcoholics

20   Anonymous and Narcotics Anonymous but that you

21   stopped because you did not have anything in

22   common with the other people that were going to

23   the meetings.   Is that true?

24         INMATE DANG:   No, ma'am.

25         DEPUTY COMMISSIONER MOORE:   You had, not

26   too long ago you had arthroscopy knee surgery on

27   both knees --

54

1      **INMATE DANG:**  Yes.

2      **DEPUTY COMMISSIONER MOORE:**  Is that

3  right?

4      **INMATE DANG:**  Yes, ma'am.

5      **DEPUTY COMMISSIONER MOORE:**  And you're

6  recovering from that pretty well.

7      **INMATE DANG:**  It still hurt.

8      **DEPUTY COMMISSIONER MOORE:**  Okay.  Under

9  Clinical Assessment, when you arrived for your

10  interview, the doctors found you to be

11  appropriately groomed; you were very

12  cooperative; and you appeared to be of your

13  stated age.  And Current Diagnostic Impressions,

14  there were no diagnosis of any mental health

15  concerns.  Your GAF score was 85.  They

16  discussed with you the crime and you indicated

17  that at the time that these crimes were

18  committed that you had dropped out of school.

19      **INMATE DANG:**  Yes.

20      **DEPUTY COMMISSIONER MOORE:**  You had run

21  away from home.

22      **INMATE DANG:**  Yes.

23      **DEPUTY COMMISSIONER MOORE:**  And you were

24  living with these friends.

25      **INMATE DANG:**  That's right.

26      **DEPUTY COMMISSIONER MOORE:**  Why did you

27  drop out of school and run away from home?

55

1        **INMATE DANG THROUGH INTERPRETER:**  At that
2   point in time I was young and really liked fun.
3        **DEPUTY COMMISSIONER MOORE:**  Say that last
4   part again.
5        **INMATE DANG THROUGH INTERPRETER:**  I was
6   young and I liked fun, fun things.
7        **DEPUTY COMMISSIONER MOORE:**  What did you
8   do that was fun with your friends?
9        **INMATE DANG THROUGH INTERPRETER:**  Okay,
10  things like, you know, go to the coffee shop and
11  dancing club and things like that.
12       **DEPUTY COMMISSIONER MOORE:**  You told the
13  doctor that your friends talked you into doing
14  the robber where gambling was going on in the
15  house.  Is that true?
16       **INMATE DANG:**  Yes, ma'am.
17       **DEPUTY COMMISSIONER MOORE:**  You said that
18  you weren't thinking straight and when you
19  friends asked you to go along you just agreed.
20  You denied having a gun and when your friends
21  drew there guns and started to do a robbery of
22  the people there that that's when you
23  participated and also realized that it was a
24  mistake.
25       **INMATE DANG:**  Yes, ma'am.
26       **DEPUTY COMMISSIONER MOORE:**  You didn't
27  know what you could do at the time even though

56

1   you knew it was a mistake.  So you followed your

2   friends, the robbers, outside after the money

3   and jewelry were taken.  You also talked about

4   the kidnapping, you told the doctors that you

5   came along to the car after your friends had

6   already pulled the gun and had the car under

7   control.

8        INMATE DANG:  Yes, ma'am.

9        DEPUTY COMMISSIONER MOORE:  When asked

10  why you participated in these crimes, you told

11  the doctor that you "were just young, stupid and

12  listened to the wrong people.  That you wished

13  that you would have listened to your aunt

14  instead of your friends and not let yourself be

15  talked into doing this."

16       INMATE DANG:  Yes, ma'am.

17       DEPUTY COMMISSIONER MOORE:  With regard

18  to the offense, you said that you "were scared

19  and trying to get away and not thinking clearly

20  when you joined your companions in the car.  But

21  now that you are older you know right from wrong

22  and no one is going to talk you into doing

23  anything stupid.  If you could do it over again

24  you would never have come to California but

25  would have remained in Hawaii."

26       INMATE DANG:  Yes, ma'am.

27       DEPUTY COMMISSIONER MOORE:  "You realize

1   that the victims were scared during the offenses

2   and you are glad they weren't harmed, but you

3   feel bad for them." The doctor agrees with your

4   assessment of the factors that caused your

5   crime, including the ability to resist pressure

6   from your friends and that you couldn't see what

7   was going to happen and you had little

8   appreciation at the time for right versus wrong.

9   Under Assessment of Dangerousness, you have not

10   demonstrated any dangerous behavior while you've

11   been incarcerated, having received no violence

12   or aggressive disciplinary write-ups. Your

13   violence potential in prison is minimal. "If

14   released your violence potential is estimated to

15   be low in comparison to the average inmate,

16   probably no greater than the average citizen."

17   You don't have any criminal history was

18   considered as a factor, and you have no

19   subsequent history in prison. You have, to the

20   doctors, expressed an appropriate degree of

21   insight and remorse. Significant risk factors

22   and precursors to violence the doctor notes that

23   you were youthful and susceptible, was the word

24   he used, to peer pressure, to the pressure of

25   your friends. "An inability to foresee

26   consequences and only a vague sense of right

27   versus wrong." The doctor, I believe, makes an

58

1  error in the number of years in his report,

2  indicated that "in the 20 years since the

3  offense," and we're not at 20 years since the

4  offense, we're coming up on 15 years. So there

5  is an error in the report. He indicates that

6  you have managed to steer clear of behavioral

7  problems, and I would suggest 128s are

8  considered behavioral problems, and that the

9  period of time is more along the lines of eight

10  years since your last 128 and not 20 years. The

11  doctor has the opinion that you appear to have

12  the ability to resist, to not go along with

13  negative peer influences, to understand

14  consequences for your choices, and to know the

15  difference between right and wrong. And it

16  appears that the risk factors for violence that

17  apply to you at the age of 19 no longer apply at

18  the age of 34. The doctor says that there are

19  no recommendations from a mental health point of

20  view. With that, that is the psychological

21  report, Commissioner.

22      **PRESIDING COMMISSIONER INGLEE:** Thank you

23  very much. Before we move on, I want to note

24  that in going through some documents here, a

25  page had inadvertently been stuck on another

26  documents, and it is a page which deals with

27  other commitment offenses that were charged

59

1    against Mr. Dang.  Consequently, I want to read

2    those into the record now.   Yes?

3              **INMATE DANG THROUGH INTERPRETER:**  He

4    would like for you to speak a little bit louder.

5              **PRESIDING COMMISSIONER INGLEE:**   All

6    right.  These are other commitment offenses that

7    I failed to read into the record when the

8    Hearing first started.  What happened was that

9    the document became attached to another piece of

10   paper that we have here and I found it during

11   the post conviction discussion.  So I'm going to

12   read this into the record right now.  Along with

13   the incident offense that you are currently in

14   prison for, that being kidnap, robbery while

15   armed, you also were charged with robbery-first-

16   degree, Penal Code CPC212.5A, San Bernardino,

17   same case number, that being SCR55894.  You were

18   also charged with being armed, P.C. 12022(a)(1),

19   again same county and same case number, and that

20   was count one; robbery-first-degree,

21   P.C. 212.5(a), San Bernardino, again, same case

22   number, that's count three; robbery-first-

23   degree, P.C. 212.5(a), same county, same case

24   number, count four; robbery-first-degree,

25   P.C. 212.5(a), same county, same case number,

26   count five; again, robbery-first-degree,

27   P.C. 212.5(a), same county, same case number,

60

1   that's count six; robbery-first-degree,

2   P.C. 212.5(a), same county, same case number,

3   that's count seven; robbery-first-degree,

4   P.C. 212.5(a), same county, same case number,

5   that's count eight; robbery-first-degree,

6   P.C. 212.5(a), San Bernardino, again, same case

7   number, that's count nine; finally, robbery-

8   first-degree, P.C. 212.5(a), same county, same

9   case number, that's count ten.  Okay, I have no

10  questions of the inmate.  Does the district

11  attorney have any questions?

12          DEPUTY DISTRICT ATTORNEY BULLOCH:  Yes, I

13  would like the inmate to explain to the Panel

14  how and when they planned the robbery.

15          PRESIDING COMMISSIONER INGLEE:  When did

16  you plan the robbery?

17          INMATE DANG THROUGH INTERPRETER:  That

18  happened early that night when they said that we

19  need some money to pay for the dancing and they

20  called me to join them.

21          PRESIDING COMMISSIONER INGLEE:  So you

22  planned the home robbery the same day, the same

23  night?

24          INMATE DANG THROUGH INTERPRETER:  That

25  only day that's happened.

26          PRESIDING COMMISSIONER INGLEE:  Okay.

27          DEPUTY DISTRICT ATTORNEY BULLOCH:  And

61

1    where was this planned at?

2         PRESIDING COMMISSIONER INGLEE:  Where did

3    this planning take place?

4         INMATE DANG THROUGH INTERPRETER:  When I

5    was in L.A.

6         PRESIDING COMMISSIONER INGLEE:  Say that

7    again, please?

8         INMATE DANG THROUGH INTERPRETER:  In L.A.

9         PRESIDING COMMISSIONER INGLEE:  In Los

10   Angeles.

11        INMATE DANG THROUGH INTERPRETER:  In Los

12   Angeles.

13        PRESIDING COMMISSIONER INGLEE:  It took

14   place in Los Angeles.

15        INMATE DANG THROUGH INTERPRETER:  Yes.

16        PRESIDING COMMISSIONER INGLEE:  But what

17   specific location?  At someone home?  At a

18   business?  Where did it take place?

19        INMATE DANG THROUGH INTERPRETER:  Where I

20   lived.

21        PRESIDING COMMISSIONER INGLEE:  Where you

22   lived?

23        INMATE DANG:  Yes.

24        PRESIDING COMMISSIONER INGLEE:  In Los

25   Angeles.  All right.

26        DEPUTY DISTRICT ATTORNEY BULLOCH:  Did he

27   personally borrow the car to drive all the

62

1  suspects to the crime scene?

2        PRESIDING COMMISSIONER INGLEE:  Did you

3  borrow the car that drove the suspects to the

4  crime scene?

5        INMATE DANG:  Yes, sir.

6        PRESIDING COMMISSIONER INGLEE:  Okay.

7  That was from your sister?

8        INMATE DANG THROUGH INTERPRETER:  From

9  the landlord where I rented.

10        PRESIDING COMMISSIONER INGLEE:  From the

11  landlord.

12        INMATE DANG THROUGH INTERPRETER:  Yeah.

13        DEPUTY DISTRICT ATTORNEY BULLOCH:  May I

14  continue?

15        PRESIDING COMMISSIONER INGLEE:

16  Certainly.

17        DEPUTY DISTRICT ATTORNEY BULLOCH:  Was

18  the car borrowed for the sole purpose of

19  committing this robbery?

20        PRESIDING COMMISSIONER INGLEE:  Was the

21  car borrowed to commit the robbery?

22        INMATE DANG THROUGH INTERPRETER:  Yes.

23        PRESIDING COMMISSIONER INGLEE:  Yes.

24        DEPUTY DISTRICT ATTORNEY BULLOCH:  At the

25  time he borrowed the car and was planning the

26  robbery, did he know that one or more of his

27  associates was part of the Black Dragon Gang?

63

1     **PRESIDING COMMISSIONER INGLEE:** Did you

2 know that members of the group that committed

3 the robbery were members of the Black Dragon

4 Gang?

5     **INMATE DANG THROUGH INTERPRETER:** Okay, I

6 didn't know until I read in the paper that they

7 belong to the Black Dragon.

8     **DEPUTY DISTRICT ATTORNEY BULLOCH:** At the

9 time of the planning of the robbery did they all

10 agree not to bring any identification or I.D.

11 cards with them when they committed the robbery?

12     **PRESIDING COMMISSIONER INGLEE:** Did you

13 plan to not bring any identification with you

14 when you, all the participates, to not bring any

15 identification with you when you committed the

16 robbery?

17     **INMATE DANG THROUGH INTERPRETER:** That I

18 don't' know.

19     **PRESIDING COMMISSIONER INGLEE:** Was it

20 discussed?

21     **INMATE DANG THROUGH INTERPRETER:** No.

22     **DEPUTY DISTRICT ATTORNEY BULLOCH:** What

23 roll did he play in trying to contact the

24 victims as the trial was going on to intimidate

25 them from coming in to testify?

26     **PRESIDING COMMISSIONER INGLEE:** What role

27 did you play in contacting victims during the

64

1    trial in order to intimidate them?

2        **INMATE DANG THROUGH INTERPRETER:**  Okay, I

3    hear that one in court.  I know nothing about

4    whatever planning that they have.

5        **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Can he

6    explain --

7        **DEPUTY COMMISSIONER MOORE:**  I'm going to

8    just pause because we're going to turn the

9    tapes.  Thank you.

10            (TAPE 1, SIDE B, ENDS)

11            (TAPE 2, SIDE A, BEGINS)

12        **DEPUTY COMMISSIONER MOORE:**  We're back on

13    record at 10:25.

14        **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Can he

15    explain that after the -- strike that.  Can he

16    explain why the victims' phone numbers were

17    found in his cell after they had been called and

18    threatened to come in to testify.

19        **PRESIDING COMMISSIONER INGLEE:**  Why were

20    telephone numbers of the victims' who were

21    threatened found in your cell?

22        **INMATE DANG THROUGH INTERPRETER:**  I

23    didn't know that in my home I have that phone

24    number.

25        **PRESIDING COMMISSIONER INGLEE:**  I'm

26    sorry, say that again, please.

27        **INMATE DANG THROUGH INTERPRETER:**  I don't

1   know why I have the phone number in the cell.  I

2   don't know why that phone number was in the

3   cell.

4         **PRESIDING COMMISSIONER INGLEE:**  All

5   right.

6         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Does

7   he agree that those phone numbers were found in

8   his cell?

9         **PRESIDING COMMISSIONER INGLEE:**  Do you

10   agree that the phone numbers were found in your

11   cell?

12         **INMATE DANG THROUGH INTERPRETER:**  I don't

13   know that I have that phone number.

14         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  I'll

15   just refer the Panel to page eight of the

16   Appellate Decision, the footnotes, footnote five

17   references the search of his cell right after

18   the victims were threatened, where it discloses

19   that the phone numbers were found in his cell.

20   If it's all right with the Panel I would like to

21   move on.

22         **PRESIDING COMMISSIONER INGLEE:**

23   Certainly.

24         **DEPUTY DISTRICT ATTORNEY BULLOCH:**  If the

25   inmate recognized immediately as he found

26   himself embroiled in this crime that it was

27   wrong why did he continue to lie to the police

1  after the crime was discovered?

2      **PRESIDING COMMISSIONER INGLEE:**  Why did

3  you continue to lie to the police after the

4  crime was discovered?

5      **INMATE DANG THROUGH INTERPRETER:**  Because

6  at that point in time I was young so I couldn't

7  really think.  The thing happened and I tried to

8  get away; I tried to avoid.

9      **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Did he

10  feel the same way when he talked to the

11  probation officer after he was convicted and

12  tried to mislead and deceive them?

13      **PRESIDING COMMISSIONER INGLEE:**  Did you

14  also mislead the probation officer when he first

15  discussed the issues with you?

16      **INMATE DANG THROUGH INTERPRETER:**  I don't

17  remember.

18      **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Did he

19  testify in the trial?

20      **PRESIDING COMMISSIONER INGLEE:**  Did you

21  testify during the trial?

22      **INMATE DANG THROUGH INTERPRETER:**  Yes.

23      **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Did he

24  tell the truth?

25      **PRESIDING COMMISSIONER INGLEE:**  Did you

26  tell the truth?

27      **INMATE DANG THROUGH INTERPRETER:**  No, I

67

1   didn't tell the truth.

2       DEPUTY DISTRICT ATTORNEY BULLOCH:   At

3   what point in the last 14 years did he come to

4   the conclusion that he had done something wrong?

5       PRESIDING COMMISSIONER INGLEE:   At what

6   point in your incarceration over the last 14

7   years did you make the decision that you had

8   done something that was wrong?

9       INMATE DANG THROUGH INTERPRETER:   Around

10  when I was 30 years old, three zero years old.

11      DEPUTY DISTRICT ATTORNEY BULLOCH:   Has

12  the inmate done anything to pay the $6,000 in

13  restitution?

14      PRESIDING COMMISSIONER INGLEE:   Have you

15  done anything to repay the $6,000 in

16  restitution?

17      INMATE DANG THROUGH INTERPRETER:   I did

18  go to work and my people did send me some money.

19      PRESIDING COMMISSIONER INGLEE:   Did he

20  actually provide -- did he actually repay any of

21  the $6,000 in restitution?

22      INMATE DANG THROUGH INTERPRETER:   I did

23  pay some?

24      PRESIDING COMMISSIONER INGLEE:   How much?

25      INMATE DANG THROUGH INTERPRETER:   Over

26  one thousand.

27      DEPUTY DISTRICT ATTORNEY BULLOCH:   I have

68

1    no further questions.

2         PRESIDING COMMISSIONER INGLEE:   All

3    right.  Counsel.

4         ATTORNEY LEWIS:   Yes, I have a couple.

5    Your accomplices Sau and Chu are they Chinese?

6         INMATE DANG:   They Chinese.

7         ATTORNEY LEWIS:   Answer in Vietnamese

8    even though I'm asking the question.   You are

9    Vietnamese?  Is that correct?

10        INMATE DANG THROUGH INTERPRETER:   Yes.

11        ATTORNEY LEWIS:   Now with regards to the

12   Black Dragon Gang, is that comprised only of

13   Chinese people?

14        INMATE DANG THROUGH INTERPRETER:   I don't

15   know.

16        ATTORNEY LEWIS:   Are you a member of the

17   Black Dragon Gang?

18        INMATE DANG THROUGH INTERPRETER:   No.

19        ATTORNEY LEWIS:   How is that your

20   accomplices reached Mr. Salazar's car before you

21   got there?

22        INMATE DANG THROUGH INTERPRETER:   Could

23   you please repeat the question?

24        ATTORNEY LEWIS:   Mr. Salazar was the

25   owner of the car where he and his girlfriend

26   were sitting in the car when your accomplices

27   reached the car with a gun and told them:   "Get

69

1  us out of here." How is it that they got to the

2  car before you did?

3      **INMATE DANG THROUGH INTERPRETER:** I

4  really don't know my friends got there first.

5      **ATTORNEY LEWIS:** Did they run faster than

6  you?

7      **INMATE DANG THROUGH INTERPRETER:** Yes,

8  maybe.

9      **ATTORNEY LEWIS:** And once they reached

10  the car how many seconds afterwards did you

11  reach the car? Was it two? Three? Four?

12      **INMATE DANG THROUGH INTERPRETER:** From

13  two to three minutes.

14      **ATTORNEY LEWIS:** Three minutes?

15      **INMATE DANG THROUGH INTERPRETER:** I so

16  scared so really couldn't tell the time.

17      **ATTORNEY LEWIS:** How many minutes were

18  they ahead of you when you ran from the scene of

19  the Lopez home?

20      **INMATE DANG THROUGH INTERPRETER:** I don't

21  know.

22      **ATTORNEY LEWIS:** Did you ever have a

23  weapon during the commission of this crime?

24      **INMATE DANG THROUGH INTERPRETER:** No.

25      **ATTORNEY LEWIS:** So it wasn't you who

26  pulled the gun on Mr. Lopez and told him: "Get

27  us out of here." Is that correct?

70

1    **INMATE DANG THROUGH INTERPRETER:**  That's
2    correct.  I never had a weapon during that
3    crime.

4    **ATTORNEY LEWIS:**  Thank you.  No further
5    questions.

6    **PRESIDING COMMISSIONER INGLEE:**  All
7    right.  Does the Deputy Commissioner have any
8    further questions?  I have one more question
9    getting back to the Black Dragon for just a
10   moment.  Did you consider yourself an associate
11   of the gang Black Dragon?

12   **ATTORNEY LEWIS:**  Commissioner, I'm going
13   to have to interject an objection on that.  He's
14   already been asked and answered that question
15   that he didn't know that his associates were in
16   the Black Dragons until he read it in the
17   newspaper.

18   **PRESIDING COMMISSIONER INGLEE:**  Well, I'm
19   still going to ask.

20   **ATTORNEY LEWIS:**  Of course.

21   **PRESIDING COMMISSIONER INGLEE:**  Do you
22   consider yourself an associate of the Black
23   Dragons?

24   **INMATE DANG THROUGH INTERPRETER:**  Before
25   I didn't know anything.  After I read the paper
26   then I know they Black Dragon, but it's too late
27   now.

1    **PRESIDING COMMISSIONER INGLEE:**  My last

2    question:  How long did you know these -- how

3    long had you known these associates that you

4    committed the crime with?  For how long a period

5    of time?

6    **INMATE DANG THROUGH INTERPRETER:**  It's

7    about one year.

8    **PRESIDING COMMISSIONER INGLEE:**  And they

9    never discussed their relationship with the

10   Black Dragon Gang in that year period?

11   **INMATE DANG THROUGH INTERPRETER:**  No.

12   **PRESIDING COMMISSIONER INGLEE:**  All

13   right, let's go summary.

14   **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Yes.

15   **PRESIDING COMMISSIONER INGLEE:**  District

16   Attorney.

17   **DEPUTY DISTRICT ATTORNEY BULLOCH:**  Thank

18   you.  I should star off by saying that there is

19   some commendable actions on the part of this

20   inmate with respect to his behavior while

21   incarcerated it has been at least not violent,

22   and he should be commended for that, that he has

23   turned the corner so to speak with respect to

24   that.  But what is abundantly clear throughout

25   the entire discussion here is that this inmate

26   doesn't have a full grasp on why he committed

27   the life offense in this particular case, nor

72

1  has he been completely candid with this Panel

2  and all authorities, and that's evidenced by

3  just the psychological report that we have from

4  May 6th, less than a month ago, when he was

5  disclosing what had happened as far as the life-

6  crime to the psychologist and no where does he

7  mention what his real role in this case was.

8  Essentially what he does is minimize his

9  behavior to the psychologist. And I think that

10 goes a long way to explain why the psychologist

11 thinks that this inmate is no more dangerous

12 than anybody else off the street, and not many

13 people have 17 robberies and a kidnapping in

14 their background. But at nowhere in the

15 inmate's rendition of the life-crime does he

16 admit to the psychologist that he actually was

17 one of those individuals that was taking the

18 money and jewelry off the victims. Nowhere in

19 this rendition of the facts did he indicate that

20 he borrowed the car to drive the suspects to the

21 crime location. Nowhere in this psychological

22 report does he say that he was part of the

23 planning process. In fact he misleads the

24 psychologist by saying that he kind of just fell

25 into this whole situation, when the truth of

26 matter is that we at least know that he drove 30

27 or 40 miles from his location in L.A. County, he

73

1   lived in Montebello or Monterey Park at that

2   point in time, into San Bernardino, which is

3   probably more than 30 or 40 miles, plenty of

4   time, nonetheless, to change his mind and figure

5   out what he was doing was wrong.  So just as

6   late as a month ago this inmate is misleading a

7   psychologist for purposes of self-serving reason

8   of trying to convince this that he is a safe

9   person to be released.  All this underscores the

10  complete and inescapable conclusion that this

11  inmate does not understand the scope of his

12  behaviors.  While said today that at least since

13  he was 30 years old, which was three or four

14  years ago, that he's come to the realization

15  that what he did was wrong and that he has taken

16  responsibility for that and that's not enough

17  time.  At least from the time he was 19 to the

18  time he was 30 he wasn't; he was in denial, he

19  was lying and he was misleading various

20  authorities including psychologist, the prison

21  system, probation, and law enforcement; he was

22  in denial.  And all his behavior, with respect

23  to the psychologist, suggest that he hasn't

24  worked out all those issues with respect to

25  understanding what he did, what his role was.

26  And for him to just merely tell this Panel that

27  it was just immature peer pressure that got him

74

1    into this situation is in a word, hogwash.  He

2    knows how he got into that situation; he knows

3    right from wrong and he knew it when he was 19

4    that you don't go into somebody's house and rob

5    them and take their money.  It's complete lack

6    of insight on his behavior.  I would encourage

7    the Panel to deny him a parole date for a

8    maximum period of time.

9           **PRESIDING COMMISSIONER INGLEE:**  Thank you

10   very much.  Counsel.

11          **ATTORNEY LEWIS:**  I disagree with the

12   Deputy D.A. here today.  My client admitted to

13   this Board that he collected the items while at

14   the Lopez home; that his accomplices held the

15   weapons used in the crimes, not only at the

16   Lopez home but to abduct Mr. Salazar to

17   commander his vehicle.  It appears obvious to me

18   that Sue [phonetic] or Sau and Chu needed a ride

19   and that they found a gullible follower who

20   could get the vehicle that they needed to commit

21   this felony, these felonies.  The man that you

22   see here today is not the man who committed

23   robbery at the Lopez' home and who was the

24   accessory to the kidnapping of Louis Salazar on

25   September 6, 1991, 14 years ago.  At that time

26   he was a follower.  Mr. Dang should be found

27   suitable for parole.  The following supports

75

1  Mr. Dang in his contention that he has earned a

2  second chance by being suitable for parole:  he

3  has taken responsibility for the life-crime; he

4  has admitted guilt to the Board here today; and

5  he has admitted guilt to other psychiatric

6  evaluators; and he has been convicted of these

7  crimes by a jury of his peers.  The

8  circumstances tending to indicate suitability

9  include:  my client has no juvenile record;

10  Mr. Dang does have a record of assaulting others

11  -- does not have a record of assaulting others;

12  and other than this life-crime he has no adult

13  record as well, this is his only crime; Mr. Dang

14  has a suitable up bringing and vast family

15  support; Mr. Dang has been commended for

16  excellent and/or above average work performance

17  by working well with his supervisors and peers

18  and he has a great attitude; Mr. Dang has

19  expressed remorse for his crime, not only to

20  this Board but to his psychiatric evaluator last

21  month.  More importantly, however, Mr. Dang, has

22  demonstrated his remorse by programming here and

23  at other institutions by attending AA, although

24  he has never had a drug or alcohol dependence

25  problem.  With regard to vocation training he is

26  a little light, although he is on the list and

27  there is a language bearer that exists and the

1    lists are so full that he is finding problems

2    getting into these courses.  However, he has

3    gone through AA Impact group and some other

4    courses or self-help assistance and he has tried

5    to make him a better human being.  Mr. Dang

6    committed his crime as a result of significant

7    stress in his life, at that time, due to his

8    youth, the desire for money and the lack of

9    skills to earn it, frustration, ignorance, and

10   peer pressure.  While incarcerated Mr. Dang has

11   earned a GED in September 30, 2003.  Mr. Dang

12   lack any significant history of violent crime;

13   this, again, is his only crime.  At the time of

14   the crime Mr. Dang was 19 years old; he is now

15   34.  At age 34 the probability of recidivism is

16   vastly reduced.  Mr. Dang's parole plans, if

17   he's not deported, are solid and feasible.  He

18   has a residence that has been assured by his

19   brother James Dang and there are support letters

20   to show that.  He also have employment plans to

21   work with his brother in his up scale beauty

22   salon by first being the janitor or gofer or

23   whatever it may take, and if he's able to

24   acquire a cosmetology license then he will

25   actually jump in and get a booth and start

26   cutting hair and performing those types of

27   duties.  Mr. Dang has marketable skills as a

77

1   barber and in electronics.  With regard to

2   discipline, Mr. Dang institutional activities

3   indicate an enhanced ability to function within

4   the law upon release.  During his incarceration

5   he has one 115, and that was back in 1993, and

6   he does have seven 128s, which the last one was

7   given to him in 1998, but none of the RVRs

8   [phonetic] involve violence, illicit drugs or

9   illicit alcohol.  Currently his job assignment

10  is as a porter and he has been receiving

11  excellent reviews with regards to that.  His

12  level of dangerousness as assessed by

13  Dr. Portnoff is low and in fact Dr. Portnoff has

14  opined that's my client's level of dangerousness

15  is not greater than the average human being.

16  Mr. Dang has a network of family support that

17  will not be there forever; people do drift away.

18  Mr. Dang has a job offer that will not always be

19  there, and Mr. Dang's parole plans are feasible.

20  Mr. Dang has demonstrated that he can succeed

21  without resorting to violence in the community.

22  Therefore, we respectfully request that my

23  client be granted parole in order to allow him

24  to continue on with his life as a productive

25  member of society.  However, if this Board is of

26  the opinion that there may be some areas that my

27  client needs to upgrade and work on, we further

78

1    request that a one-year denial be granted.  We

2    submit.

3            **PRESIDING COMMISSIONER INGLEE:**  Fine,

4    thank you very much.  Mr. Dang, you now have an

5    opportunity to tell us why you are suitable for

6    parole.  You can go with what your attorney has

7    just said, but we certainly encourage you to

8    tell us why you are suitable for parole.

9            **INMATE DANG THROUGH INTERPRETER:**  Now I'm

10   older.  When I did that I only 19 years old.

11   Now I can tell wrong from right, or right from

12   wrong.  I would like to have a second chance.

13           **PRESIDING COMMISSIONER INGLEE:**  Okay,

14   very good.  With that we are going to recess for

15   deliberations.  The time is now 10:42.

16                       R E C E S S

17                       --oOo--

18

19

20

21

22

23

24

25

26

27

79

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3        **PRESIDING COMMISSIONER INGLEE:**  Yes, we

4    are back in session now in the matter of Huy

5    Dang, H-U-Y, capital D-A-N-G, CDC number

6    H-40124.  The Panel has reviewed all information

7    received from the public and relied on the

8    following circumstances in concluding that the

9    prisoner is not suitable for parole and, in

10   fact, would pose an unreasonable risk of danger

11   to society or a threat to public safety if

12   released from prison.  Mr. Dang, this is your

13   Initial Hearing.

14       **INMATE DANG:**  Yes.

15       **PRESIDING COMMISSIONER INGLEE:**  And I

16   want to be sure that you understand number one,

17   everything that we have done here today, and

18   that you know that this will be a basis for

19   what's going to come forward.  Also, we need to

20   emphasize to you the need for you to understand

21   the enormity of the crime and your participation

22   in the crime.  In this regard the offense was

23   carried out in an especially cruel and callous

24   manner, in that you and your associates,

25   particular that you actively participated in a

26   home-invasion robbery --

27   **HUY DANG    H-40124    DECISION PAGE 1      6/1/06**

1       INMATE DANG:  Yes.

2       PRESIDING COMMISSIONER INGLEE:   -- and

3   eventual kidnapping.  Multiple victims were

4   attacked, one was injured and 15, appropriately

5   15 were traumatized.  In separate incident, one

6   victim's was abused, and this is Mr. Salazar,

7   who was hit in the head by a pistol during the

8   kidnapping.  The offense was carried out in a

9   manner which demonstrates a callous disregard

10  for human suffering, in that appropriately 15

11  people were robbed at gunpoint, two others were

12  kidnapped at gunpoint while you were attempting

13  to flee the crime scene.  The motive of the

14  crime was certainly very trivial in relation to

15  the actual offense itself.  Your associates and

16  you did not -- this issue did not deter you from

17  later committing another crime, in this regard

18  first the home-invasion crime and then you

19  committed another crime when you kidnapped

20  Mr. Salazar and his friend.  These conclusions

21  are drawn from the Statement of Facts that says:

22  that you were in the initial planning or part of

23  the planning of this crime; that you in

24  particularly borrowed a car from your landlord;

25  you traveled from Los Angeles County down to San

26  Bernardino with an associate; the automobile was

27  HUY DANG    H-40124    DECISION PAGE 2    6/1/06

81

1    used in the actual crime itself or the home-

2    invasion; you participated in this crime with

3    members of an Asian gang, by the name of Black

4    Dragon, in the home-invasion, where

5    appropriately 15 people were held hostage as

6    they were at a party gambling and eventually

7    they were robbed; in the robbery itself, you

8    were the one that gathered the money and jewels

9    and initially held onto the money and jewels;

10   you took part in the kidnapping of two victims

11   and the automobile as a getaway; and later you

12   hid the money and jewelry taken in the home-

13   invasion in bushes.  You fortunately had no

14   prior criminal record, although you had an

15   unstable social history in the fact that you had

16   left Vietnam during a very, I would assume, a

17   very uncomfortable time when you then went from

18   Vietnam I believe to Hawaii.  Is that correct?

19         INMATE DANG:  Yes, sir.

20         PRESIDING COMMISSIONER INGLEE:  You then

21   stayed there with your father for a while and

22   then you traveled from Hawaii to California.

23         INMATE DANG:  Yes, sir.

24         PRESIDING COMMISSIONER INGLEE:  You

25   attended school but you didn't complete school.

26   You became involved with friends who,

27   HUY DANG    H-40124    DECISION PAGE 3    6/1/06

1   unfortunately, were of the gangster ilk and were

2   leading you in the wrong direction, and you

3   became part and parcel of a group of people who,

4   it appears, were members of a notorious gang

5   called the Black Dragons, and you participated

6   in the home-invasion.  Institutionally you have

7   programmed in a limited manner while

8   incarcerated.  You have failed to develop a

9   marketable skill that can be taken to the

10  outside, a certified marketable skill that can

11  be taken to the outside.  You have, fortunately,

12  upgraded yourself educationally; you received

13  your GED, which is excellent.  You have not

14  sufficiently participated in self-help programs.

15  You have been good in regard to your discipline.

16  You have had seven 128s, the last one being

17  6/12/1998, for refusal to report to class.  You

18  should be congratulated for only having one 115,

19  and that was on 7/26/1993, for disobeying a

20  direct order.  The last psychological report is

21  5/8/2006, by L. Portnoff, P-O-R-T-N-O-F-F, PhD.,

22  and this is a favorable report.  In this report

23  they say that:  "Under a controlled setting this

24  inmate has not demonstrated any dangerous

25  behavior.  He has not received any aggressive

26  disciplinary articles.  Therefore, his violence

27  **HUY DANG    H-40124    DECISION PAGE 4**    6/1/06

83

1    potential in that setting is normal.   If

2    released to the community his violence potential

3    is estimated to be low in comparison to the

4    average inmate and probably no greater than that

5    of the average citizen.   He did not have a

6    history of criminal offense prior to committing

7    the offense.   He does not have a history of

8    subsequent behavior problems while incarcerated.

9    He expresses an appropriate degree of insight

10    and remorse."   Your parole plans, you do not

11    have residential plans within the last county or

12    legal residence; however, if you were granted a

13    date in the future, the Commissioner can order

14    you to go to another county if they believe that

15    it's in your best interest, so that's not a

16    problem necessarily and that would be up to that

17    Commissioner at that Hearing.   So you do have

18    viable residential plans and that is to move to

19    your brother in Orange County and live with him

20    and be an employee of his beauty salon.   You

21    have acceptable employment plans, but I question

22    your ability to be able to function as a barber

23    or in whatever form that is going to take place,

24    and I believe you are going to have to take

25    tests and you're going to have to be licensed.

26    So you need to consider that.

27    **HUY DANG    H-40124    DECISION PAGE 5    6/1/06**

84

1       **INMATE DANG:**  Yes.

2       **PRESIDING COMMISSIONER INGLEE:**  You do

3   not have a certified marketable skill at the

4   time and this is -- Deputy Commissioner Moore

5   will discuss this in a few moments, but you need

6   to consider this.  The District Attorney of San

7   Bernardino County made presentation and

8   recommended strongly against parole at this

9   time.  Nevertheless, you should be commended for

10  various things since you have been incarcerated

11  and also some issues that you need to be

12  reminded about and I'll ask Deputy Commissioner

13  Moore if she will take of that for me.

14      **DEPUTY COMMISSIONER MOORE:**  Okay.

15  Mr. Dang, a couple of things that you've done

16  very well and the D.A. even commented on them

17  too.  You have obtained your GED after coming to

18  prison, and that is a very good beginning and a

19  solid foundation for the future.  You need to

20  continue to build on that and to continue to

21  improve your English skills, comprehension,

22  understanding, speaking, and even writing, as

23  you remain here in prison and you can do that

24  while you're here, outside of the current job

25  that you have and I highly recommend that.  You

26  had no violence in your history since you've

27  **HUY DANG    H-40124    DECISION PAGE 6      6/1/06**

1  come to prison and you are to be congratulated

2  for that; it is a difficult situation and you've

3  done well.  You've been eight years without any

4  write-ups at all and 13 years since your 115,

5  and we talked about the not standing for count

6  and you indicated that you had been asleep.  You

7  have excellent work evaluations; you are a good

8  employee.  Your employment as a Unit Porter I

9  don't think challenges you; it's pretty easy for

10  you to be a Unit Porter.

11     **INMATE DANG:**  Yes.

12     **DEPUTY COMMISSIONER MOORE:**  Start trying

13  to find or work towards jobs that take more

14  skill, which then comes to the point that you

15  are on several waiting lists for vocations:

16  print shop --

17     **INMATE DANG:**  Uh huh.

18     **DEPUTY COMMISSIONER MOORE:**  -- and

19  computer repair.

20     **INMATE DANG:**  Right.

21     **DEPUTY COMMISSIONER MOORE:**  Very good.

22  As soon as you get into one put your attention

23  and focus on it and get the same kind of

24  reviews:  above average and exceptional.  Any

25  other vocations that you can get into, do that,

26  okay?  You're time now is not spent doing

27  **HUY DANG    H-40124    DECISION PAGE 7      6/1/06**

86

1    anything other than your work.  You need to --
2    so all of those things are to be commended and
3    you are doing well.  They offer programming here
4    on anger management, stress management,
5    communication skills, getting back into your
6    community, getting out of prison, how to
7    transition.  You need to take any classes,
8    programs, workshops that you can take that
9    increases your English verbal skills so that you
10   can develop even more understanding about your
11   crime, you drove the car that brought everyone
12   there, to understand your participation, when
13   you started with this it was before you got to
14   the house.  Some of what we've heard today from
15   you may be some English limitation, although
16   you've had the use of Mr. Mein as an
17   interpreter.
18        **INMATE DANG:**  Right.
19        **DEPUTY COMMISSIONER MOORE:**  I think part
20   of it is processing, for you to come to
21   understand not your small involvement but your
22   bigger involvement, and any workshops that you
23   can work on or programs that would permit you to
24   do this would be of great benefit to you at your
25   next Hearing.  So continue upgrading your
26   English skills, any classes that you can take:
27   **HUY DANG    H-40124    DECISION PAGE 8    6/1/06**

87

1    writing, reading, speaking.  Do you understand?

2         INMATE DANG:  Yes.

3         DEPUTY COMMISSIONER MOORE:  Okay.  You've

4    done a good job but you need to continue.  This

5    is your foundation; it's the beginning.

6         INMATE DANG:  I only have one problem and

7    it's speak in front of people, I get nervous.

8    That's the only problem I got because after I

9    (indiscernible) and that's how I get that GED.

10        DEPUTY COMMISSIONER MOORE:  And what

11   you're talking about is practice.

12        INMATE DANG:  Because even though in my

13   language I just get scared reading in front of

14   people or talk out loud people to people.

15   That's one thing I get real nervous.

16        DEPUTY COMMISSIONER MOORE:  Okay.  So

17   you've got to practice at that, okay?  It causes

18   you to be nervous and anxious but work through

19   it and start practicing.

20        INMATE DANG:  Yes.

21        DEPUTY COMMISSIONER MOORE:  Okay.  That's

22   all I have.

23        PRESIDING COMMISSIONER INGLEE:  All

24   right, I would like to just follow up on that.

25   Do they have an organization here called

26   Toastmasters?  Toastmasters is in many prisons.

27   HUY DANG    H-40124    DECISION PAGE 9    6/1/06

88

1   You might just want to write that down and see

2   if they have it here at the prison.  If they

3   have --

4        INMATE DANG:  I don't think so.

5        PRESIDING COMMISSIONER INGLEE:  It's an

6   organization, it's a club where people learn how

7   to speak and give presentations to groups.  It's

8   a very, very large organization; it's in the

9   free world, it's all over.  Almost every city

10  has one or two chapters of Toastmasters.  It is

11  something that you may want to give thought to.

12       INMATE DANG:  I don't believe they have

13  this kind of program in this prison.

14       PRESIDING COMMISSIONER INGLEE:  Well,

15  maybe you should be aggressive enough to talk to

16  your counselor to see if they would let you

17  consider starting a Toastmaster organization

18  here.  Why not?

19       INMATE DANG:  (indiscernible).

20       PRESIDING COMMISSIONER INGLEE:  You're

21  the one who needs it.  It's an excellent

22  organization.  I'm sure that everybody here

23  knows what I'm referring to.  All right, let's

24  move ahead.  However, all these positive aspects

25  of your behavior do not outweigh your factors of

26  unsuitable at this time.  In a separate

27  HUY DANG    H-40124    DECISION PAGE 10    6/1/06

89

1  decision, the Hearing Panel noted that it is not

2  reasonable to expect that parole would be

3  granted during the next two years.  Specific

4  reasons are as follows:  The prisoner committed

5  the offense which was especially cruel and

6  violent.  In this regard you participated in the

7  planning of the crime; you borrowed the actual

8  automobile that was used in the crime itself,

9  and in that regard you traveled from San

10  Bernardino County, excuse me, you traveled from

11  Los Angeles to San Bernardino County to

12  participate in this robbery; you participated in

13  this robbery with members of the well known

14  Asian gang called the Black Dragons, and in this

15  regard you were part of a home-invasion where

16  you attacked appropriate 15 people that were

17  having a party and in some cases gambling; you

18  took and held the cash that was taken from the

19  various people at the party; you were part of a

20  kidnapping of two victims to acquire a getaway

21  car, which eventually lead to having the police

22  stop you and being arrested; and you, also,

23  prior to that time hid the money and jewels in

24  bushes before you left the scene.  Multiple

25  victims were attacked and one was injured, 15

26  were traumatized in two separate incidents.  The

27  **HUY DANG    H-40124    DECISION PAGE 11    6/1/06**

90

1  offense was carried out, certainly, in a

2  dispassionate and cruel manner.  A victim was

3  abused during the offense and in this regard

4  Mr. Salazar was hit in the head with a pistol.

5  The offense was carried out in a manner which

6  demonstrated an exceptional callous disregard

7  for human suffering.  The motive of the crime

8  was truly trivial in relation to the actual

9  offense.  You fortunately did not have any prior

10  criminal record and you do not have any recent

11  serious disciplinary violations.  The Panel

12  recommends that you: of course, remain

13  disciplinary free;, if available start to be

14  able to access certification in vocations; if

15  available continue to participate in self-help

16  programs; and I reference back to what Deputy

17  Commissioner Moore just got finished speaking to

18  you about.  And as far as learning public

19  speaking I'll just say one more time the name of

20  the organization is called Toastmasters --

21       **INMATE DANG:**  Yes, sir.

22       **PRESIDING COMMISSIONER INGLEE:**  -- and

23  you may wish to look into this and even ask your

24  counselor to see if it's possible that if a

25  Toastmasters isn't here if it could be started

26  in the prison.  This is not something new,

27  **HUY DANG    H-40124    DECISION PAGE 12    6/1/06**

91

1    Toastmaster's actually exist in other prisons in

2    the State of California.

3           INMATE DANG:  Yes, sir.

4           PRESIDING COMMISSIONER INGLEE:  Deputy

5    Commissioner Moore?

6           DEPUTY COMMISSIONER MOORE:  No thank you.

7           PRESIDING COMMISSIONER INGLEE:  All

8    right, good luck sir.

9           INMATE DANG:  Thank you.

10          PRESIDING COMMISSIONER INGLEE:  This

11   Hearing is over.  The time is now 1:30.

12                  --oOo--

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS        SEP 2 9 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   HUY DANG   H-40124   DECISION PAGE 13   6/1/06

92

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, J. FARNCOMB, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total Four in number and

cover a total of pages numbered 1 - 91, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

INITIAL PAROLE CONSIDERATION HEARING of HUY DANG, CDC

NO. H-40124, on June 1, 2006, and that the foregoing

pages constitute a true, complete, and accurate

transcription of the aforementioned tape to the best

of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated August 16, 2006, at Sacramento,

California.

J. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**